KEKER, VAN NEST & PETERS LLP
ERIC H. MACMICHAEL - # 231697
emacmichael@keker.com
STEVEN A. HIRSCH - # 171825
shirsch@keker.com
MAILE YEATS-ROWE - # 321513
myeatsrowe@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiffs ARASH FERDOWSI and ARASH
FERDOWSI REVOCABLE TRUST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARASH FERDOWSI and ARASH FERDOWSI REVOCABLE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A., and FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REPUBLIC BANK,<br><br>Defendants. | Case No. 3:24-cv-4644<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT [28 U.S.C. § 2201]**<br><br>Date Filed:  July 31, 2024 |

Plaintiffs Arash Ferdowsi and Arash Ferdowsi Revocable Trust (collectively, "Ferdowsi"), by and through their attorneys, bring this Complaint for Declaratory Judgment against defendants JPMorgan Chase Bank, N.A. ("JPM Bank") and the Federal Deposit Insurance Corporation as Receiver for First Republic Bank ("FDIC"). Ferdowsi seeks a declaration under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that he has the right to proceed with an arbitration described herein under the auspices of the Financial Industry Regulatory Authority ("FINRA"), and that the Defendants, which are not parties to that arbitration, have no right to interfere with that arbitration by any means, whether by seeking to enjoin it, intervene in it, or remove it.

## INTRODUCTION

1.      Arash Ferdowsi is the co-founder and former Chief Technology Officer of Dropbox, a groundbreaking company that revolutionized cloud-based file sharing. Until early 2024, he was a client of a prominent investment adviser, Arif Ahmed ("Ahmed"), who works for J.P. Morgan Private Wealth Advisors LLC ("JPMPWA") and its affiliated brokerage firm, J.P. Morgan Securities LLC ("JPMS," and together with JPMPWA, "JPM Wealth"). Recently, Ferdowsi initiated a FINRA arbitration (the "FINRA Arbitration") against Ahmed and JPM Wealth seeking over $225 million in damages for steering him into highly improper investments. These investments were selected for no legitimate investment purpose, but rather because they allowed JPM Wealth to extract over $40 million in hidden fees that it then shared with Ahmed.

2.      Specifically, Ahmed steered Ferdowsi into complex, low-performing investment vehicles with exorbitant embedded fees that were *fifteen times higher* than the advisory fees that Ferdowsi and Ahmed had agreed upon. To make matters worse, Ahmed compounded his rent-seeking strategy by churning Ferdowsi's account, recommending unnecessarily early and frequent trades. Each of these trades lined Ahmed's and JPM Wealth's pockets with further fees while causing ever-increasing harm to Ferdowsi's portfolio.

3.      When Ferdowsi first discovered the improper fees in December 2023 and confronted Ahmed about them, Ahmed evaded and lied. Soon after, JPM Wealth informed Ferdowsi—without any explanation—that he had a matter of weeks to close all of his investment

2731907

accounts before they would be liquidated.

4.      Ahmed and JPM Wealth's fraudulent mismanagement of Ferdowsi's investments, compounded by their retaliatory closing of his accounts, violated their fiduciary and other common-law duties, a host of applicable FINRA Rules, and federal securities laws. Through the FINRA Arbitration, Ferdowsi seeks to recover his considerable damages. Ferdowsi filed his arbitration claims solely against the three parties responsible for those damages: Ahmed, JPMPWA, and JPMS.

5.      Despite their irrelevance to the FINRA Arbitration, the Defendants in this case assert that Ferdowsi's claims are improperly brought against JPM Wealth because the "real party in interest" is Defendant FDIC. To arrive at that position, the Defendants look to the fact that JPMPWA and JPMS previously operated as First Republic Investment Management, Inc. ("FRIM") and First Republic Securities Company, LLC ("FRSC")—wholly owned subsidiaries of First Republic Bank, which failed and was sold by the FDIC to JPM Bank on May 1, 2023. According to Defendants, although JPM Bank acquired FRIM and FRSC in their entirety (as assets of First Republic Bank), the "FDIC retained liability for this matter," requiring Ferdowsi's claims to be brought through the administrative claims process in the FDIC's receivership of First Republic Bank (the "Receivership").

6.      Defendants' position is baseless. FRIM and FRSC were never placed in receivership, are not FDIC depository institutions, and have been not only solvent but hugely profitable both before and after First Republic Bank's failure. In fact, even after JPM Bank's acquisition of FRIM and FRSC on May 1, 2023, they continued to operate independently for several months, continued to collect significant fees from Ferdowsi and mismanage his accounts, and were not rebranded to be part of the JPMorgan franchise until almost six months later. They are merely two assets—wholly distinct corporations—among many others that JPM Bank acquired as a result of First Republic Bank's failure.

7.      Defendants' implied threats to interfere with the FINRA Arbitration are credible, as they have done exactly that in a number of recent cases. Most notably in the *Nickel* action, currently pending in this Court, Defendants have sought to preclude 16 former FRIM investment

advisers from pursuing claims against JPM Wealth in FINRA arbitrations.[1] Defendants' actions in *Nickel* and other similar cases make clear the playbook they undoubtedly will try to follow here as well: *first*, argue that FRIM and FRSC's prior connection to First Republic Bank is sufficient to require that Ferdowsi's claims against JPM Wealth be diverted to the administrative claims process of the Receivership; and *second*, declare that it is now *too late* to assert such claims in that Receivership. Defendants thus will seek to deny Ferdowsi a remedy (or leave him with a drastically diminished one) for the substantial damages he suffered at the hands of Ahmed and JPM Wealth.

8.      For reasons set forth in greater detail below, none of the Defendants' arguments for precluding Ferdowsi's claims against JPM Wealth in the FINRA Arbitration have merit. Among other things: **(1)** FRIM and FRSC were not depository institutions subject to the FDIC's statutory receivership authority; **(2)** the agreement governing the FDIC's sale of First Republic Bank's assets provided for JPM Bank's acquisition of FRIM and FRSC in their entirety, including the assumption of their liabilities; and **(3)** FRIM and FRSC have remained solvent and operational at all times and were never purported to be part of the Receivership.

9.      Defendants' anticipated efforts to enjoin or intervene in Ferdowsi's FINRA Arbitration would risk undermining the speed and efficiency of that arbitration in violation of the strong pro-arbitration policy enshrined in the Federal Arbitration Act, 9 U.S.C. §§ 1–16. A declaratory-judgment action therefore will result in a just and more expeditious determination of the controversy presented in this action (regarding the propriety of the FINRA Arbitration) *and* of the underlying controversy presented in the FINRA Arbitration (regarding the propriety of JPM Wealth's management of Ferdowsi's accounts).

10.     Accordingly, for reasons set forth more fully below, the Court should grant the requested declaratory judgment.

**PARTIES**

11.     Plaintiff Arash Ferdowsi is a resident of New York since May 2023. Prior to that,

---

[1] *See* Complaint for (1) Declaratory Judgment and (2) Injunctive Relief, *J.P. Morgan Securities, LLC as successor in interest to First Republic Securities Co., LLC et al. v. Nickel et al.*, No. 4:24-cv-02574-JST (N.D. Cal. Apr. 30, 2024).

he resided in San Francisco, California, where he maintains a part-time property.

12.     Plaintiff Arash Ferdowsi Revocable Trust is a trust established under and governed by California law, with Arash Ferdowsi as its sole trustee.

13.     Defendant JPM Bank is an American national bank with its main office in Columbus, Ohio. JPM Bank serves as the consumer and commercial banking subsidiary of JPMorgan Chase & Co., one of the world's largest banking institutions, with operations in more than 50 countries.

14.     Defendant FDIC is an independent federal agency headquartered in Washington, D.C.

## JURISDICTION

15.     Federal-question jurisdiction exists under 28 U.S.C. § 1331 because any civil suit in which the FDIC is a party in any capacity "shall be deemed to arise under the laws of the United States." 12 U.S.C. § 1819(b)(2)(A).

16.     Federal-question jurisdiction also exists under 28 U.S.C. § 1331 because the question of Defendants' right to enjoin or interfere with the FINRA Arbitration implicates the FDIC's powers under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821. If Defendants were to bring the lawsuit that this declaratory-judgment action seeks to prevent, they would assert FIRREA as at least one basis for federal-question jurisdiction. (JPM Bank did, in fact, recently assert this jurisdictional basis in the *Nickel* action.)

17.     To the extent that Ferdowsi's claims for declaratory relief require construction of the Purchase and Assumption Agreement in which the FDIC sold FRIM and FRSC to JPM Bank, those questions arise under state common law and this Court has supplemental jurisdiction to decide them under 28 U.S.C. § 1367.

## VENUE

18.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in the Northern District of California. The contracts

between Ferdowsi and JPM Wealth were issued to Ferdowsi in this District. Further, the vast majority of the alleged acts and omissions of JPM Wealth that gave rise to the claims asserted in the FINRA Arbitration took place in this District. Venue is also proper in this District under 12 U.S.C. § 94 because this action is brought, in part, against the FDIC as receiver of First Republic Bank, whose primary place of business was located in this District.

## DIVISIONAL ASSIGNMENT

19.     This civil action should be assigned either to the Oakland Division or to the San Francisco Division because a substantial part of the events or omissions giving rise to the claim occurred in San Francisco.

## FACTUAL BACKGROUND

**Ferdowsi and JPM Wealth agree to FINRA arbitration of their disputes.**

20.     The facts of the underlying dispute are set forth in greater detail in Ferdowsi's Statement of Claim in the FINRA Arbitration ("Statement of Claim"), a true and correct copy of which is annexed hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

21.     Ferdowsi is the co-founder and former Chief Technology Officer of Dropbox, a groundbreaking company that revolutionized cloud-based file sharing.

22.     Before May 1, 2023, FRIM and FRSC were the two pillars of First Republic Bank's wealth-management division. In the decade before they were sold to JPM Bank and later rebranded as JPM Wealth, FRIM and FRSC had established themselves as one of the preeminent wealth management operations in the San Francisco Bay area. The firms were known for attracting top-tier brokers and advisers from larger competitors through their lucrative bonuses. And they had grown their balance sheets with successful campaigns targeting high-net-worth clients, including many of the area's technology entrepreneurs. Ahmed was one of FRIM's most successful financial advisers, with a roster of prominent clients from the technology sector.

23.     In 2020, Ferdowsi was recruited by Ahmed to join many of his peers in entrusting the management of his investments to FRIM. On January 9, 2020, Ferdowsi and FRIM entered into an Investment Management Agreement ("IMA") governing multiple accounts, including that of the Arash Ferdowsi Revocable Trust. The IMA featured an agreement to arbitrate disputes

before the American Arbitration Association ("AAA") but added that, **"In the event that the dispute is subject to a predispute arbitration clause under a brokerage agreement with a broker-dealer affiliate of [FRIM], [Ferdowsi] or [FRIM] may invoke the arbitration of that agreement in lieu of the arbitration process of this section. . . ."**

24.     Also on January 9, 2020, the Arash Ferdowsi Revocable Trust signed a Trust Account Application (the "FRSC Account Application") to set up a brokerage account with FRSC, a FINRA-registered broker-dealer and wholly owned subsidiary of First Republic Bank. Ferdowsi signed the Application in his capacity as Trustee. The Application contained the following arbitration agreement (the "FRSC Arbitration Agreement"):

(a)     **Agreement to Arbitrate Controversies.** IT IS AGREED THAT ANY CONTROVERSY BETWEEN FRSC, OR ITS AFFILIATES, AND YOU OR THE CLEARING BROKER AND YOU, ARISING OUT OF FRSC AND CLEARING BROKER'S BUSINESS OR THIS AGREEMENT, SHALL BE SUBMITTED TO ARBITRATION CONDUCTED BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AND IN ACCORDANCE WITH ITS RULES. ...

This agreement reflected that broker-dealers, as FINRA members, are required by FINRA Rule 12200 to arbitrate all customer claims before FINRA. Thus, as to any dispute against FRIM and FRSC falling within the scope of the FRSC Arbitration Agreement, Ferdowsi could elect to pursue a single FINRA arbitration instead of initiating separate arbitrations under FINRA and the AAA.

25.     The IMA and the FRSC Account Application constituted contracts between Ferdowsi and FRIM and FRSC, respectively, and not between Ferdowsi and First Republic Bank or any other entity. The contracts referred to First Republic Bank only in passing as an "FDIC-insured affiliate" of the contracting subsidiary. By contrast, each contract contained the express disclaimer that FRIM and FRSC are "not insured by the FDIC." The FRSC Account Application, for example, contained the following bold, all-capitals statement just above the signature line:

"**INVESTMENTS, INSURANCE, AND ADVISORY PRODUCTS AND SERVICES ARE NOT FDIC INSURED,**

NOT BANK GUARANTEED, AND MAY LOSE VALUE." A substantially identical statement is found on other disclosures, brochures, pamphlets, and websites describing the services offered by FRIM and FRSC (or, today, by JPM Wealth).

**Ahmed steers Ferdowsi into improper investments so that JPM Wealth could collect tens of millions of dollars in obscured fees.**

26.     Between April 2020 and October 2023, Ahmed advised Ferdowsi to invest in dozens of complex structured notes called Market-Linked Investments ("MLIs") as a means of gaining market exposure to the technology sector. But Ahmed and JPM Wealth failed to inform Ferdowsi that the MLIs were specifically designed to include large, embedded fees paid to JPM Wealth. Those fees were many multiples greater than the fees on similar investments that Ferdowsi could have invested in. Moreover, Ahmed had agreed with Ferdowsi that JPM Wealth would be compensated through a flat 0.25% financial-advisory fee that would not be affected by the selection of any particular investments. But the MLI fees, disguised as "underwriting discounts," typically amounted to 3.75% of the MLI purchase price—15 times the agreed-upon advisory fee.

27.     Ahmed and JPM Wealth collected over $40 million in fees from Ferdowsi's investments by churning Ferdowsi's account through repeated MLI purchases, which totalled a staggering $1 billion across 35 investments. JPM Wealth paid a substantial portion of those fees to Ahmed, who became one of FRIM's highest-paid financial advisers as a result.

28.     Ahmed and JPM Wealth's misconduct occurred both before and after the May 1, 2023, closure of First Republic Bank. Indeed, Ahmed and JPM Wealth sold Ferdowsi over $100 million of MLIs after that date and continued to charge him exorbitant fees and cause significant harm to his portfolio.

29.     By steering Ferdowsi into MLIs rather than suitable investments such as index funds or large-cap technology stocks, Ahmed and JPM Wealth caused Ferdowsi to sustain total damages of over $225 million.

**First Republic Bank—but not FRIM or FRSC—is closed and placed in FDIC receivership.**

30.     In early 2023, Silicon Valley Bank, a California-based bank with $175 billion in

deposits, collapsed seemingly overnight, shortly followed by New York-based Signature Bank. First Republic Bank then experienced a "run on the bank." The U.S. Treasury Department stepped in to shore up the banking system; and soon after, on May 1, 2023, the California Department of Financial Protection and Innovation ("Cal DFPI") took possession of First Republic Bank, closed it, and appointed the FDIC as receiver. The FDIC accepted the appointment and, on the same day, accepted a bid from JPM Bank for certain assets of First Republic Bank, with the sale memorialized in a Purchase and Assumption Agreement ("P&A Agreement").

31.     FRIM[2] and FRSC[3], as assets of First Republic Bank, were sold to JPM Bank in their entirety as solvent, going concerns. Neither FRIM nor FRSC were included in the FDIC's Receivership, which solely governed the failed First Republic Bank. In fact, the FDIC lacked the authority to proceed otherwise regarding these nonbank subsidiaries.

32.     The FDIC accepted the Cal DFPI's appointment under the authority conferred to it by 12 U.S.C. § 1821(c)(1). That provision states in part that the FDIC "may accept appointment and act as conservator or receiver *for any insured depository institution* upon appointment" by state agencies like the Cal DFPI. FRIM and FRSC were not, and never have been, "insured depository institutions." The statute defines "insured depository institution" as "any bank or savings association the deposits of which are insured by the [FDIC] pursuant to this chapter." *Id*., § 1813(c)(2). "Depository institution" is defined, in turn, as "any bank or savings association." *Id*., § 1813(c)(1). FRIM and FRSC were not banks or savings associations, nor were they insured by the FDIC—as prominently stated in their disclosures, marketing materials, and client contracts. Consequently, the FDIC never could and never did serve as their "conservator or receiver" under 12 U.S.C. § 1821(c)(1).

---

[2] From May 1, 2023, through October 1, 2023, FRIM continued to operate as an SEC-registered investment adviser and was a wholly owned subsidiary of JPM Bank. On October 1, 2023, as part of a corporate reorganization and through a series of internal transactions, FRIM became JPMPWA.

[3] From May 1, 2023, through October 1, 2023, FRSC continued to operate as an SEC-registered broker-dealer and was a wholly owned subsidiary of JPM Bank. On October 1, 2023, FRSC was merged into JPMS.

2731907

33.     The P&A Agreement between the FDIC and JPM Bank confirms that FRIM and FRSC were sold to JPM Bank in their entirety, in accordance with the proper treatment of distinct corporate entities. For example, it defines JPM Bank's "Acquired Assets" to include "assets of [First Republic Bank]," but to *exclude* the assets of the acquired subsidiaries, stating: "Assets owned by Subsidiaries of the Failed Bank are not 'Acquired Assets' within the meaning of this definition by virtue of being owned by Subsidiaries of [First Republic Bank]." Accordingly, JPM Bank acquired FRIM and FRSC in the manner typical of most corporate acquisitions: by acquiring their *shares*, not by purchasing their underlying *assets*. As solvent businesses conveyed to JPM Bank, FRIM and FRSC retained their separate corporate existence, including their separate assets ***and liabilities***.

34.     The P&A Agreement makes clear in other ways that FRIM's and FRSC's liabilities would travel with their assets to their new corporate home, rather than be left behind in the Receivership. For example, when specifying the liabilities that would be excluded from the sale to JPM Bank, the P&A Agreement clearly limited the excluded liabilities to those "*that the Failed Bank has*," with "Failed Bank" defined to mean First Republic Bank as distinct from its subsidiaries like FRIM and FRSC. This reflected the clear intention that the acquired subsidiaries retain their own liabilities, which are distinct from the liabilities of the failed First Republic Bank. Furthermore, under the P&A Agreement, the FDIC has partially indemnified JPM Bank for non-ordinary-course subsidiary liabilities discovered post-sale (likely covering the type of misconduct alleged by Ferdowsi). That indemnification provision would be superfluous if—as the FDIC has elsewhere claimed[4]—all liabilities of the acquired subsidiaries had been left behind in the Receivership.

35.     Moreover, in the *Nickel* action, JPM Wealth (as successor to FRIM and FRSC) has

[4] In other proceedings, the FDIC has mischaracterized references to "subsidiaries" in the excluded liabilities provisions of the P&A Agreement as meaning that the liabilities of the subsidiaries were retained in the Receivership. This is false. Rather, the provisions are clear that *only* liabilities "the Failed Bank has" were excluded. These excluded liabilities could include those "arising out of ... the operation or conduct of any business of the Failed Bank *or its Subsidiaries*." However, recognizing that the Failed Bank could have excluded liabilities arising from its subsidiaries is entirely different from suggesting that the subsidiaries themselves were somehow stripped of all their liabilities when sold to JPM Bank. The P&A Agreement does not purport to strip the subsidiaries of their liabilities, nor would it have been legally permissible to do so.

conceded in the underlying arbitrations that the *Nickel* advisers' claims that arise from a contract with FRIM—like Ferdowsi's claims here—were "properly before th[e] FINRA arbitration panel"[5], before reversing its position when the matter reached this Court. In those same arbitrations, JPM Wealth contended that the only claims that were barred under FIRREA, and thus required to proceed under the FDIC's administrative claims process, were those "essentially" against First Republic Bank. JPM Wealth's admission that claims against FRIM and FRSC could "properly" be arbitrated in FINRA is irreconcilable with any assertion that all of their liabilities were severed and retained in the Receivership.

36.    Facts on the ground support the conclusion that FRIM and FRSC, as solvent non-depository institutions, were largely unaffected by First Republic Bank being placed in receivership. For example, FRIM and FRSC not only maintained ordinary operations through First Republic Bank's liquidity crisis and failure, but also through the creation of the Receivership and their acquisition by JPM Bank. They were never closed down or declared insolvent by any state or federal agency; nor were they ever placed in any form of receivership.

37.    Indeed, the FDIC's own actions confirm that FRIM and FRSC were never intended to be part of the Receivership. The FDIC published a statutorily required notice to creditors of First Republic Bank on May 1, 2023, setting a deadline of September 5, 2023, for creditors of the "Failed Institution" to present their claims in the Receivership. But no such notice was ever given to creditors of First Republic Bank's *nonbank subsidiaries* like FRIM and FRSC. If the FDIC had believed that all liabilities of the First Republic Bank's nonbank subsidiaries were retained in the Receivership, it would have provided similar notice to affected creditors—as required by statute and by due process.

38.    Furthermore, after their sale to JPM Bank on May 1, 2023, FRIM and FRSC continued all normal services and operations—under the same FRIM and FRSC names and trade dress, in the same offices, with the same employees, management, and clients—for months. JPM Wealth has touted this fact, stating that FRIM and FRSC were never "closed by regulators" and

---

[5] *Nickel*, No. 4:24-cv-02574-JST at Dkt. Nos. 24-22, 24-26.

"continued to operate" throughout the same period as the Receivership.[6] It was not until October 1, 2023, that FRIM was renamed JPMPWA and FRSC merged with and into JPMS. In public filings, JPMPWA explains that it was "formerly known" as FRIM but is substantively a continuation of the same company; JPMS describes itself as a "successor in interest" to FRSC.[7]

39.     Even today, while FRIM and FRSC operate under new names, little about their businesses appears to have changed since their sale to JPM Bank. Their websites continue to bear much of their old trade dress; they offer the same services; and they have retained most of their brokers and advisers—including Arif Ahmed—as well as their former clients, whose fees have caused JPMorgan's wealth-management revenues to soar. In fact, JPMorgan's earnings report for the first quarter of 2024 revealed that its Asset and Wealth Management Division reported a 7% increase in revenues over the prior year, after taking FRIM's and FRSC's considerable wealth-management portfolios into account. When those portfolios were excluded, however, the division reported a *drop in revenues* of 1%.

**Ferdowsi exercises his right to bring a FINRA Arbitration against Ahmed and JPM Wealth.**

40.     On July 30, 2024, Ferdowsi filed a Statement of Claim with FINRA against Ahmed and JPM Wealth, in accordance with FINRA Rules, the FRSC Arbitration Agreement, and the IMA. *See* Exhibit A hereto.

41.     The Statement of Claim alleges that Ahmed, JPMPWA, and JPMS violated various legal duties including common law obligations, FINRA Rules, the SEC's whistleblower protection rule, and other federal and state securities laws. Based on those violations, Ferdowsi alleges Counts for (1) fraud, (2) violation of California Corporations Code § 25400, (3) violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of SEC Rule 10b-5 promulgated thereunder, (4) control-person liability under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, (5) breach of fiduciary duty, (6) negligent supervision of Ahmed by JPMPWA and JPMS, and (7) negligence.

---

[6] *Nickel*, No. 4:24-cv-02574-JST at Dkt. 24-5.

[7] *Id.*

COMPLAINT FOR DECLARATORY JUDGMENT [28 U.S.C. § 2201]
Case No. 3:24-cv-4644

2731907

42.     Ferdowsi's Statement of Claim asserts **no** claim against, and alleges **no** wrongful act or omission by, JPM Bank or First Republic Bank. Ferdowsi's Statement of Claim **only** asserts claims against, and wrongful acts and omissions by, Ahmed, JPMPWA, and JPMS— parties that are **not** federally insured depository institutions and that have never been placed in receivership.

**The risk that Defendants will seek to interfere with the FINRA Arbitration gives rise to an actual and concrete controversy warranting declaratory judgment.**

43.     In February 2024, Ferdowsi demanded in writing that JPM Wealth compensate him for the substantial injuries he suffered as a result of Ahmed steering him into purchasing MLIs. While Ferdowsi's demand made clear that he was seeking compensation on account of violations of "duties that JPMPWA, [JPMS] and Mr. Ahmed owed to [him]," JPMorgan's counsel refused to engage with Ferdowsi. Instead, JPMorgan's counsel said they "understand [that] the FDIC retained liability for this matter, has granted indemnity to JPM, and is the real party in interest."

44.     The clear implication from JPMorgan's counsel was that Ferdowsi's claims must be brought as part of the FDIC administrative claims process and can only be asserted against the FDIC as First Republic Bank's receiver.

45.     There is thus a credible threat that JPM Bank and the FDIC will seek to disrupt the FINRA Arbitration, as they have done in other actions, including the *Nickel* case filed in this Court on April 30, 2024. That case, now pending before the Honorable Jon S. Tigar, concerns a series of FINRA arbitrations between JPM Wealth and former FRIM investment advisers regarding the advisers' failure to repay certain loans after resigning in the wake of First Republic Bank's collapse. In *Nickel*, JPM Bank, supported by the FDIC, is seeking to enjoin the advisers from asserting certain counterclaims and defenses in the FINRA arbitrations. JPM Bank and the FDIC contend that those counterclaims and defenses can only be asserted in the Receivership's administrative claims process.

46.     *Nickel* and other recent cases reveal the playbook that Defendants are anticipated to follow here in an effort to extinguish Ferdowsi's claims. *First*, Defendants will contend that the

Receivership's administrative claims procedures are Ferdowsi's sole avenue for asserting his claims. *Second*, Defendants will contend that it is *too late* for Ferdowsi to bring those claims against the Receivership (and, even if not too late, that Ferdowsi's recoveries are limited to whatever is available from First Republic Bank's limited receivership assets).

47.     To the contrary, there is no legal basis upon which Ferdowsi's claims against Ahmed and JPM Wealth—a solvent, going concern that has never been in receivership—can be forced into the Receivership. For all of these reasons, Ferdowsi's claims against Ahmed and JPM Wealth are properly subject to adjudication in the FINRA Arbitration. Ferdowsi therefore brings this action seeking to protect his right to litigate his claims in that arbitral forum, and to prevent Defendants from attempting to deprive him of that right by interfering with, hindering, or delaying that proceeding.

## CAUSE OF ACTION FOR DECLARATORY JUDGMENT

### (against JPM Bank and the FDIC)

48.     Ferdowsi realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

49.     The controversy over whether Ferdowsi may proceed with his FINRA Arbitration is definite and concrete, touching the legal relations of parties having adverse legal interests. It is real and substantial and admits of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. The facts alleged herein, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

50.     If Defendants were allowed to take actions or to seek remedies that would interfere with, hinder, or delay Ferdowsi's FINRA Arbitration, it would undermine the speed and efficiency of that arbitration in violation of the strong pro-arbitration policy enshrined in the Federal Arbitration Act, 9 U.S.C. §§ 1–16. A declaratory-judgment action therefore will result in a just and more expeditious determination of the controversy presented in this action (regarding the propriety of the FINRA Arbitration) *and* of the underlying controversy presented in the

FINRA Arbitration (regarding the propriety of JPM Wealth's management of Ferdowsi's accounts).

51. Accordingly, the Court should exercise its discretion under 28 U.S.C. § 2201 to issue the declaration requested below in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. A declaratory judgment stating that:

a. Subject to any contrary finding by the FINRA arbitrator, Ferdowsi has the right under his arbitration agreements with JPM Wealth to bring and maintain a FINRA Arbitration against JPM Wealth to resolve the controversies and claims in the FINRA Arbitration.

b. Ferdowsi's FINRA Arbitration and the claims that Ferdowsi asserts therein are in no way barred or otherwise affected by the fact that those claims were not presented in the administrative claims process of the First Republic Bank Receivership.

2. Such other and further relief as the Court deems just and proper.

Dated: July 31, 2024                                KEKER, VAN NEST & PETERS LLP

By:  /s/ *Eric H. MacMichael*
ERIC H. MACMICHAEL
STEVEN A. HIRSCH
MAILE YEATS-ROWE

Attorneys for Plaintiffs ARASH FERDOWSI and ARASH FERDOWSI REVOCABLE TRUST