# Exhibit A

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**DISPUTE RESOLUTION**

| | |
|---|---|
| ARASH FERDOWSI and ARASH FERDOWSI REVOCABLE TRUST, <br><br>             *Claimants*, <br><br>      v. <br><br> ARIF AHMED, J.P. MORGAN PRIVATE WEALTH ADVISORS LLC, and J.P. MORGAN SECURITIES LLC, <br><br>             *Respondents*. | Case No. _____ <br><br><br> <u>**STATEMENT OF CLAIM**</u> |

Claimant Arash Ferdowsi, by and through his undersigned counsel, submits this Statement of Claim on behalf of himself and Claimant Arash Ferdowsi Revocable Trust (the "Ferdowsi Trust") for which Mr. Ferdowsi is the sole trustee, against Respondents Arif Ahmed, J.P. Morgan Private Wealth Advisors LLC ("JPMPWA"), and J.P. Morgan Securities LLC ("JPMS," and together with JPMPWA, "JPM Wealth") seeking damages and states as follows.

<u>**PRELIMINARY STATEMENT**</u>

1.      Claimant Arash Ferdowsi is an entrepreneur and co-founder of Dropbox, one of the original innovators in cloud-based file-sharing technology.  Mr. Ferdowsi brings this claim on behalf of himself and the Ferdowsi Trust against his registered investment adviser, Arif Ahmed, his investment advisory firm, JPMPWA, and his broker-dealer, JPMS, to recover damages for their rampant violations of obligations to Mr. Ferdowsi in connection with the management of his investment accounts.

2.      Between April 2020 and October 2023, Mr. Ahmed and JPM Wealth advised Mr. Ferdowsi to invest through the Ferdowsi Trust in dozens of complex structured notes called

Market-Linked Investments ("MLIs"), as a means of gaining market exposure to the technology sector.  Mr. Ahmed and JPM Wealth did not disclose to Mr. Ferdowsi, however, that the MLIs he was steered into purchasing were specifically designed by Mr. Ahmed and JPM Wealth to include exorbitant embedded fees paid to JPM Wealth, which were 15 times greater than their agreed-upon advisory fee.  These fees were never discussed with Mr. Ferdowsi and, indeed, were purposely obscured in multiple communications.  Most notably, Mr. Ahmed lied in response to direct questions from Mr. Ferdowsi about the fees, contending that the fees were retained by the banks issuing the MLIs when, in fact, they were paid to JPM Wealth.

3.     The high-cost, low-performance MLIs that Mr. Ahmed and JPM Wealth steered Mr. Ferdowsi into purchasing served no legitimate investment purpose.  Rather, they were selected by Mr. Ahmed for Mr. Ferdowsi's investment account because of the significant benefit they delivered to JPM Wealth and Mr. Ahmed, not to Mr. Ferdowsi.  Moreover, Mr. Ahmed exacerbated the harm to Mr. Ferdowsi by repeatedly recommending that he trade out of MLIs well before their maturity in order to invest in other MLIs.  The stated reasons for these MLI swaps—such as to "book profits" or "harvest losses"—were pretextual, disguising the true motive of multiplying the fees that JPM Wealth could collect at Mr. Ferdowsi's expense.

4.     By churning Mr. Ferdowsi through repeated MLI purchases, Mr. Ahmed caused Mr. Ferdowsi to purchase over $1 billion worth of MLIs in less than four years, even though he was never invested in more than $350 million worth of MLIs at any one time.  This churning served Mr. Ahmed's apparent purpose, allowing JPM Wealth to collect over $40 million in fees on Mr. Ferdowsi's MLI purchases and sales.  A substantial portion of those fees was funneled by JPM Wealth to Mr. Ahmed as "incentive" compensation, making him one of JPM Wealth's highest-paid employees while managing Mr. Ferdowsi's account.

5.     The harm to Mr. Ferdowsi from Mr. Ahmed and JPM Wealth putting their own interests ahead of his was profound.  By steering Mr. Ferdowsi into MLIs rather than suitable investments—such as index funds or large-cap technology stocks—Mr. Ahmed and JPM Wealth caused Mr. Ferdowsi to suffer over $225 million in damages.[1]  Mr. Ahmed's and JPM Wealth's conduct also violated a multitude of legal obligations to Mr. Ferdowsi, including breaches of fiduciary duties, applicable FINRA Rules, and federal and state securities laws.  Mr. Ferdowsi brings this claim seeking to recover the damages he has suffered as a result of these violations.

## PARTIES

6.     Arash Ferdowsi is a technology entrepreneur and co-founder of Dropbox, a popular cloud-based file-sharing service.  Mr. Ferdowsi has been a resident of New York since May 2023.  Prior to that, he resided in San Francisco, California, where the vast majority of events giving rise to this dispute occurred.  He continues to maintain a part-time property in San Francisco.

7.     The Ferdowsi Trust is a trust established and governed by California law, with Mr. Ferdowsi as the sole trustee.

8.     Arif Ahmed (CRD# 3099755) is an investment adviser representative of JPMPWA and a registered representative of JPMS who markets himself to the founders of technology companies.  Upon information and belief, Mr. Ahmed is a resident of the District of Columbia.

9.     JPMPWA (CRD# 108559) is an investment adviser that was registered with the SEC at all times relevant to this Statement of Claim.  Prior to October 1, 2023, JPMPWA was known as First Republic Investment Management, Inc. ("FRIM"), a New York corporation with its principal place of business in San Francisco, California.  Prior to May 1, 2023, FRIM was a wholly owned subsidiary of First Republic Bank.  On May 1, 2023, when First Republic Bank

---

[1]  As of June 28, 2024.

went into receivership, FRIM was acquired by JPMorgan Chase Bank, N.A. ("JPM Bank") when it acquired substantially all of the assets of First Republic Bank.  From May 1, 2023, through October 1, 2023, FRIM continued to operate as a registered investment adviser and was a wholly owned subsidiary of JPM Bank.  On October 1, 2023, as part of a corporate reorganization and through a series of internal transactions, FRIM became JPMPWA, a wholly owned subsidiary of JPMorgan Chase Holdings LLC, which is a wholly owned subsidiary of JPMorgan Chase & Co.  The MLI transactions at issue in this Statement of Claim occurred both before and after JPM Bank's acquisition of FRIM.

10.     JPMS (CRD# 79) is a broker-dealer registered with the SEC.  On October 1, 2023, First Republic Securities Company, LLC ("FRSC") was merged into JPMS.  Prior to October 1, 2023, FRSC was a Nevada limited liability company and a national broker-dealer, with its principal place of business in San Francisco, California, and a member of FINRA.  At all relevant times prior to May 1, 2023, FRSC was a wholly owned subsidiary of First Republic Bank.  On May 1, 2023, when First Republic Bank went into receivership, FRSC was acquired by JPM Bank when it acquired substantially all of the assets of First Republic Bank.  From May 1, 2023, through October 1, 2023, FRSC continued to operate as a broker-dealer and was a wholly owned subsidiary of JPM Bank before being merged into JPMS.  The MLI transactions at issue in this Statement of Claim occurred both before and after JPM Bank's acquisition of FRSC.

## JURISDICTION

11.     FINRA has jurisdiction over this matter pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes because arbitration is required by written agreements between Mr. Ferdowsi and JPM Wealth.  The agreements provide for mandatory FINRA arbitration of controversies between Mr. Ferdowsi, JPMS, and Mr. Ahmed, and allow for

Mr. Ferdowsi to invoke that provision for disputes involving JPMPWA.  Additionally, the dispute is between a FINRA member and its customer, and the dispute arises in connection with the business activities of a FINRA member and its associated person.

## HEARING LOCATION

12.    Mr. Ferdowsi was a resident of San Francisco, California until May 2023, during which time the vast majority of events giving rise to this dispute occurred.  Therefore, pursuant to FINRA Code of Arbitration Procedure 12213(a), the appropriate hearing location is San Francisco, California.

## FACTUAL ALLEGATIONS

I.    **Mr. Ferdowsi Entrusts Mr. Ahmed And JPM Wealth To Manage His Wealth**

13.    Mr. Ferdowsi is a successful technology pioneer and entrepreneur.  In 2007, before his final year in the Electrical Engineering and Computer Science program at MIT, Mr. Ferdowsi co-founded Dropbox, an innovative company that revolutionized cloud-based file sharing.  From its inception, Mr. Ferdowsi served as Dropbox's Chief Technology Officer.  In that role, he oversaw the evolution of Dropbox from an early prototype into a world leader in cloud-based file sharing, amassing over 500 million registered users.

14.    Though Mr. Ferdowsi has significant technology expertise, his finance and investing experience has been more limited.  This is not surprising, as the Chief Technology Officer role at Dropbox was Mr. Ferdowsi's first full-time job and required him to focus on product development and innovation, while the financial side of the business was managed by others.  As Dropbox grew, Mr. Ferdowsi became quite wealthy, though for years his wealth was largely tied up in illiquid Dropbox shares.  Even after the company's successful initial public offering in 2018, Mr. Ferdowsi had comparatively little money to invest relative to his overall net worth.  This finally changed in 2020 when Mr. Ferdowsi decided to leave Dropbox and sold his stake in the company.

15.     In early 2020, shortly before leaving Dropbox, Mr. Ferdowsi made the decision to transfer the management of his financial portfolio from his financial adviser at the time, ICONIQ Capital, to Arif Ahmed at JPMPWA (then operating as FRIM, a subsidiary of First Republic Bank, prior to FRIM's acquisition by JPM Bank).

16.     Mr. Ahmed was a well-known financial adviser who marketed himself to founders of technology companies.  In discussions with Mr. Ferdowsi, Mr. Ahmed touted that he would provide financial investment advice that was superior to the advice that Mr. Ferdowsi had been receiving at ICONIQ, and at a lower cost.  In particular, Mr. Ahmed criticized ICONIQ for its complicated fee structure.  He claimed that Mr. Ferdowsi would pay a simpler, more transparent advisory fee of 0.25% on the assets that Mr. Ahmed managed for him.

17.     This advisory fee was reflected in multiple Investment Management Agreements that Mr. Ferdowsi entered into with FRIM at the outset of their relationship and subsequently. These agreements set forth the terms and conditions under which FRIM agreed to provide "individualized account managements services" to Mr. Ferdowsi for the Ferdowsi Trust and certain other accounts.  Each of those agreements appended a "Fee Schedule" which listed a fee of 0.25% to be applied to "Total Assets Under Management."  Mr. Ahmed signed each of the agreements as the "authorized signatory" on behalf of FRIM.

18.     Lacking much investing experience, Mr. Ferdowsi turned to Mr. Ahmed to advise him on suitable investments for his portfolio.  In particular, he relied on Mr. Ahmed's guidance in building an investment portfolio focused on the technology sector, reflecting Mr. Ferdowsi's commitment to the field from his years as a technology entrepreneur.  At various times, Mr. Ferdowsi volunteered ways to achieve this exposure, such as investing in the NASDAQ-100 index or a curated basket of large-cap technology stocks like Apple, Google, and Microsoft.

Nonetheless, he ultimately deferred to Mr. Ahmed's advice on the particular investments to make given Mr. Ahmed's much greater investment expertise and credentials.

19.     Thus, when Mr. Ahmed recommended that Mr. Ferdowsi start investing in complex products tied to the technology sector, Mr. Ferdowsi trusted that Mr. Ahmed believed these investments would generate higher risk-adjusted returns compared to the NASDAQ-100 or a basket of large-cap technology stocks.  Mr. Ferdowsi also trusted that any advice he received from Mr. Ahmed was devoid of influence from any fees that JPM Wealth might earn on the transactions.

20.     This was because Mr. Ferdowsi understood that Mr. Ahmed, as a financial adviser, had a fiduciary obligation to put Mr. Ferdowsi's interests ahead of his own interests and those of JPM Wealth, and believed that Mr. Ahmed would do so regarding any investment advice he provided.  Mr. Ferdowsi further understood, based on representations by Mr. Ahmed, that he and JPM Wealth were being compensated through the flat 0.25% financial advisory fee described above.  This fee, amounting to approximately $1 million to $2 million per year depending on the size of Mr. Ferdowsi's portfolio, would not be impacted by the selection of any particular investments.  Therefore, Mr. Ferdowsi believed he was receiving independent, unbiased advice from Mr. Ahmed that prioritized Mr. Ferdowsi's interests above all others.

## II.     Mr. Ahmed And JPM Wealth Steer Mr. Ferdowsi Into Purchasing Over $1 Billion Of Market-Linked Investments

21.     In April 2020, just months after Mr. Ferdowsi moved his portfolio to JPM Wealth, Mr. Ahmed first recommended that Mr. Ferdowsi invest in a type of financial product called a Market-Linked Investment, or "MLI" for short.  Mr. Ferdowsi had no prior experience with MLIs, nor any knowledge of how they were structured or utilized as financial investments.  Rather, the information he received regarding MLIs came from Mr. Ahmed, who endorsed them as savvy investments.

22.     For example, when Mr. Ahmed first introduced Mr. Ferdowsi to the idea of investing in MLIs, Mr. Ahmed claimed to be raising it because "It is important I share good ideas with you." He attached a description of an MLI that Mr. Ahmed explained would "try to beat the [NASDAQ-100] index over long-term investing without deviating from the index." This concept was attractive to Mr. Ferdowsi who, as described above, had told Mr. Ahmed he was interested in gaining exposure to the technology sector, such as through the NASDAQ-100 index. The opportunity to "beat" the index without "deviating" from it was the exact type of "good idea" that Mr. Ferdowsi was hoping Mr. Ahmed would be introducing to him.

23.     The MLI that Mr. Ahmed recommended was a complex structure, issued by Goldman Sachs and tied to the performance of two different NASDAQ indices, with certain changes in the payouts depending on the overall performance of the two indices. The materials that Mr. Ahmed sent to Mr. Ferdowsi included a description of certain attributes of the MLI, as well as a chart purporting to show its performance under various scenarios, each of which beat or matched the index reflected in the chart. This point was further highlighted in Mr. Ahmed's cover email, where he described the MLI as having "Uncapped Upside" but only "1-for-1 Downside." He also provided a bulleted list of reasons "why we like this," which touted the investment as "overweight technology" and offering "attractive returns on the upside."

24.     While the email description that Mr. Ahmed sent to Mr. Ferdowsi highlighted numerous purported upsides to investing in MLIs, it failed to describe any downsides relative to other potential investments. For example, it failed to mention that there were additional fees associated with investing in MLIs compared to other investments. Furthermore, the email neglected to disclose that JPM Wealth would benefit from the MLI recommendation by receiving fees or commissions—despite the fact that excessive fees and commissions were the driving

motivation behind Mr. Ahmed's MLI recommendations, as discussed in detail below. Consequently, Mr. Ferdowsi believed and trusted that the only reason Mr. Ahmed was recommending an investment in the MLI was because it represented the best investment strategy that aligned with Mr. Ferdowsi's interest in the technology sector.  Based on this recommendation, Mr. Ferdowsi agreed to invest $5 million in the initial MLI.

25.     A few months later, in July 2020, Mr. Ahmed recommended that Mr. Ferdowsi invest in another MLI that Mr. Ahmed claimed to be a similarly shrewd investment for Mr. Ferdowsi's portfolio.  On Mr. Ahmed's recommendation, Mr. Ferdowsi invested $10 million in that MLI.  In the months that followed, Mr. Ahmed continued recommending additional MLIs to Mr. Ferdowsi of increasing size—some as large as $30 million apiece.  Trusting that Mr. Ahmed viewed each of these investments to be beneficial for his portfolio, Mr. Ferdowsi agreed to the recommendations.  By the end of 2020, at Mr. Ahmed's suggestion, Mr. Ferdowsi had invested $120 million across seven MLIs, making these investments a significant portion of his overall portfolio.  At no point in connection with any of these (or any future) MLI purchases, did Mr. Ahmed discuss with Mr. Ferdowsi the fees that he was paying on MLIs relative to other investments, or any benefits that Mr. Ahmed and JPM Wealth were receiving from MLI transactions.

26.     During 2021, 2022, and 2023, Mr. Ahmed continued steering Mr. Ferdowsi into yet more MLIs, claiming them to be smart investments for his portfolio.  In addition, Mr. Ahmed began recommending that Mr. Ferdowsi sell certain MLIs well before their maturity, claiming that there were tactical benefits to exiting the positions early.  In some instances, when the MLIs had increased in value, Mr. Ahmed justified the sales as "book[ing] gains."  In other instances when the MLIs had decreased in value, Mr. Ahmed justified the sales as "harvest[ing] losses."  In

virtually all cases, Mr. Ahmed recommended that the proceeds from these sales be reinvested in yet more MLIs.

27.     By rotating Mr. Ferdowsi through cycles of MLI purchases and sales, Mr. Ahmed dramatically increased the total number of MLIs that Mr. Ferdowsi ultimately purchased.  Indeed, while Mr. Ferdowsi never held more than $350 million worth of MLIs at one time, the rapid rotation through MLIs at Mr. Ahmed's recommendation resulted in Mr. Ferdowsi purchasing a staggering amount of MLIs—over $1 billion across 35 MLI transactions—by October 2023.  Over $100 million of these MLI purchases occurred after May 1, 2023, when JPM Bank acquired FRIM and FRSC.

**III.    Mr. Ahmed And JPM Wealth Engaged In Numerous Forms Of Egregious Misconduct By Causing Mr. Ferdowsi To Invest In MLIs**

28.     At the time he made each of the MLI purchases, Mr. Ferdowsi trusted and believed that Mr. Ahmed recommended the MLI because it constituted the best investment for his portfolio, given his stated investment objectives.  As Mr. Ferdowsi has since come to learn, this was not true. In fact, as detailed below, Mr. Ahmed's stated justifications for recommending MLIs to Mr. Ferdowsi were often fabricated.  Contrary to Mr. Ahmed's explanations, MLIs were highly unsuitable for Mr. Ferdowsi's portfolio.  Mr. Ahmed only steered Mr. Ferdowsi into purchasing MLIs because he and JPM Wealth stood to earn undisclosed fees that were many multiples higher than they would have earned on any suitable investments they could have recommended.

29.     In so doing, Mr. Ahmed and JPM Wealth engaged in numerous forms of misconduct in breach of their duties to Mr. Ferdowsi as described below.

A.    **Mr. Ahmed And JPM Wealth Collected Over $40 Million In Improper Fees On The MLIs That Mr. Ferdowsi Was Steered Into Purchasing**

30.    At the heart of the misconduct was Mr. Ahmed and JPM Wealth placing their financial interests ahead of Mr. Ferdowsi's by steering him into MLIs that allowed them to collect excessive fees.

31.    As background, MLIs can be designed by a structuring bank based on what it believes will be an attractive investment in the market, or be tailored at the request of a broker for that broker to sell to their clients.

32.    When brokers create MLIs for sale to their clients, one of the attributes of the MLI that the broker can tailor is the inclusion of what is often referred to in the MLI prospectus as an "underwriting discount."  In practice, however, the term underwriting discount is a misnomer since it is not an amount that goes to an underwriter.  Instead, it is an amount paid by the structuring bank *to* the requesting broker, though this is generally not disclosed in any meaningful way in the MLI prospectus.

33.    Through this underwriting discount, brokers can effectively choose the amount of fees they collect for themselves when they request that an MLI be created for their clients.  When created for sale as part of an investment advisory relationship, the underwriting discounts on MLIs are typically set to zero.  This is because the investment adviser is already being paid a flat percentage fee to manage a client's investments.  Alternatively, if the underwriting discount is set above zero, the investment adviser rebates any amounts it receives back to the client, making the effective fee zero.  Even outside of an investment advisory relationship, the underwriting discounts on MLIs are usually less than one or two percent of the total purchase price of the MLI.

34.    Here, the MLIs created at Mr. Ahmed's request were structured with an exorbitant underwriting discount, most often 3.75% of the purchase price on the MLIs sold to Mr. Ferdowsi,

but sometimes even exceeding 4%.  As illustrated in the chart below, the underwriting discounts

on the MLIs sold to Mr. Ferdowsi ranked among the highest 5% of all underwriting discounts in

the market for the type of MLI most frequently sold to him.  During the course of Mr. Ferdowsi's

advisory relationship with Mr. Ahmed, JPM Wealth collected approximately $39 million in

undisclosed fees through these underwriting discounts, all without Mr. Ferdowsi's knowledge or

consent.



35.     Beyond the underwriting discounts that JPM Wealth collected each time Mr.

Ferdowsi purchased an MLI, JPM Wealth sometimes charged additional fees when Mr. Ferdowsi

sold an MLI.  For one-third of the MLIs that Mr. Ahmed advised Mr. Ferdowsi to sell, JPM Wealth

incorporated a "markdown" on the sale of the MLI back to the issuing bank, which JPM Wealth

kept for itself.  These markdowns were unusual for any firm to charge, let alone one in the position

of JPM Wealth with fiduciary duties to act in Mr. Ferdowsi's best interests.  Over the span of

approximately ten months in 2021 and 2022, JPM Wealth's markdowns resulted in JPM Wealth

taking more than $1 million in additional fees from Mr. Ferdowsi—once again without his knowledge or consent.

36.     In total, across underwriting discounts and markdowns, JPM Wealth pocketed over $40 million in fees from the 35 MLIs that Mr. Ferdowsi purchased at Mr. Ahmed's recommendation.  This fee income was highly improper for a number of reasons.

37.     To start, taking such fees was entirely inconsistent with Mr. Ahmed's representations to Mr. Ferdowsi that JPM Wealth's compensation for providing financial advisory services would be a transparent and flat 0.25% fee.  In reality, the combination of underwriting discounts and markdowns caused Mr. Ferdowsi to incur an effective average annual fee of 5.9% on his MLIs—over 20 times higher than the fee Mr. Ahmed had represented to Mr. Ferdowsi. Whereas Mr. Ferdowsi understood that JPM Wealth's financial advisory fees might work out to $1 million to $2 million per year across his entire portfolio, JPM Wealth took over $16 million in fees on Mr. Ferdowsi's MLI purchases in 2022 alone.  Had Mr. Ferdowsi been told by Mr. Ahmed that JPM Wealth would be taking millions of dollars in additional fees on MLI purchases, he never would have agreed to invest in MLIs in the first place.

38.     To make matters worse, at the time Mr. Ahmed was recommending particular MLIs to Mr. Ferdowsi that allowed JPM Wealth to collect millions of dollars in fees, there were virtually identical MLIs in the market with better financial terms, albeit ones that would have resulted in JPM Wealth collecting substantially less fees for itself and Mr. Ahmed.  For example, in December 2022, Mr. Ahmed sold a $65 million Citibank-issued MLI to Mr. Ferdowsi with a 3.75% underwriting discount.  Meanwhile, Goldman Sachs was issuing an MLI based on the same underlying NASDAQ index, but with a higher upside participation rate, a better buffer level, and a significantly lower underwriting discount of only 0.8%.  The superior terms of the Goldman

Sachs MLI would have provided Mr. Ferdowsi an additional $2.1 million of value compared to the Citibank MLI that Mr. Ahmed recommended to him.  Similarly, in October 2023, Mr. Ahmed sold Mr. Ferdowsi a $15 million Goldman Sachs-issued MLI with a 3.75% underwriting discount. Around the same time, Citibank was offering an MLI based on the same NASDAQ index, but with a higher participation rate, a better buffer level, and a much lower underwriting discount of just 0.25%.  Had Mr. Ahmed recommended the Citibank MLI instead, Mr. Ferdowsi would have received an additional $650,000 of value compared to the Goldman Sachs MLI he actually purchased.  In these examples and many more like them, the only explanation for Mr. Ahmed recommending MLIs with worse financial terms was that these lower-performing MLIs offered larger underwriting discounts that maximized the fees JPM Wealth would receive.

39.     Moreover, to enable JPM Wealth to retain the improper MLI fees, Mr. Ahmed took inappropriate steps to bypass the typical compliance policies that are implemented to restrict the retention of commissions on advisory accounts.  To do that, Mr. Ahmed caused Mr. Ferdowsi to open a separate brokerage account that was purportedly independent of his financial advisory relationship and was designated for "high risk" investments.  Notably, however, Mr. Ahmed never discussed with Mr. Ferdowsi that MLIs were being purchased into a different account from the ones used for all other investments Mr. Ahmed recommended.  Furthermore, Mr. Ahmed never mentioned to Mr. Ferdowsi that this separate account would enable MLIs to be purchased in a different manner from his other investments, thereby allowing JPM Wealth to retain additional commissions and fees.  Indeed, it was not until December 2023 that Mr. Ferdowsi came to understand that MLIs had been purchased in any manner distinct from his other financial advisory investments.

14

40.     The embedded fees collected from Mr. Ferdowsi's MLI purchases benefited not only JPM Wealth but also Mr. Ahmed personally.   As Mr. Ferdowsi's financial adviser, Mr. Ahmed was paid a portion of the revenue that Mr. Ferdowsi's relationship generated for JPM Wealth.  Based upon information recently disclosed, Mr. Ferdowsi has learned that it was standard practice for FRIM to enter into "Transition Bonus Agreements" with new financial advisers recruited from other financial advisory firms, like Mr. Ahmed who was recruited from Merrill Lynch in 2019.   Under the Transition Bonus Agreements, financial advisers would receive "incentive" compensation and bonuses, often 40% or more of the "revenue from brokerage and investment management business" they generated.

41.     Upon information and belief, this compensation structure resulted in Mr. Ahmed earning tens of millions of dollars personally from having steered Mr. Ferdowsi into purchasing MLIs.  Indeed, Mr. Ahmed was rumored to be the subject of a May 2023 Bloomberg article entitled *First Republic's $35 Million Banker Outearned JPMorgan's Dimon Before Bust* which reported that "one unnamed banker who wasn't a top executive" had earned over $35 million in 2022.[2]  This was broadly consistent with a personal financial statement prepared by Mr. Ahmed, which reported his annual compensation for 2022 as exceeding $30 million.

42.     Nonetheless, at no point did Mr. Ahmed discuss these fees with Mr. Ferdowsi or disclose the massive financial incentive that he and JPM Wealth had to steer Mr. Ferdowsi into purchasing MLIs.  Among other violations, this was in direct contravention of FINRA guidance,

---

[2]  Hannah Levitt, *First Republic's $35 Million Banker Outearned JPMorgan's Dimon Before Bust*, Bloomberg, May 25, 2023, https://www.bloomberg.com/news/articles/2023-05-25/first-republic-s-35-million-banker-outearned-dimon-before-bust.

which warns brokers not to recommend such complex investment products due to their high fees and risks, unless the customer is fully informed and still elects to invest in them.[3]

43.     Mr. Ahmed was only able to commit these violations because JPM Wealth failed to fulfill its legal obligations to supervise him.   Indeed, the sheer scale of Mr. Ahmed's compensation alone should have been a red flag that triggered an investigation into his conduct. Not only was Mr. Ahmed's overall compensation excessive relative to other JPMPWA financial advisers, but it also reflected revenue from Mr. Ferdowsi's accounts that was many times greater than what other JPMPWA financial advisers generated from their clients.   This information was readily available to JPM Wealth, if it had actually been interested in supervising Mr. Ahmed as it was obligated to do, rather than turning a blind eye to the source of the massive revenue he was generating for the business.

44.     JPM Wealth's lax oversight and rampant supervisory failure of Mr. Ahmed was not an isolated incident.   In fact, in May 2022, JPMPWA (then operating as FRIM) reached a settlement with the SEC to resolve charges stemming from similar conduct that the SEC concluded amounted to a "fraud or deceit" on JPMPWA's clients.[4]   In that case, the SEC's charges involved JPMPWA having "caus[ed] certain advisory clients to invest in share classes of mutual funds that paid revenue sharing [to JPMPWA's affiliated broker] when share classes of the same funds were available to the client that presented a more favorable value."   The SEC concluded this was improper because "[JPMPWA's] interests were in conflict with its advisory clients' interests

---

[3] *See* FINRA Regulatory Notice 12-03 [2012], *Complex Products: Heightened Supervision of Complex Products*, https://www.finra.org/rules-guidance/notices/12-03 (describing the discussions a broker-dealer should have with its customer before recommending such products).

[4] First Republic Investment Management, Inc., Investment Advisers Act Release No. 6030, 2022 WL 1604445 (May 19, 2022) (order instituting administrative and cease-and-desist proceedings, pursuant to sections 203(e) and 203(k) of the Investment Advisers Act of 1940, making findings, and imposing remedial sanctions and a cease-and-desist order).

because [JPMPWA] had an incentive to recommend money market funds and share classes that paid the greatest amount of revenue sharing to its Affiliated Broker."  Substitute "MLIs" for "mutual funds" and Mr. Ahmed was engaging in misconduct that could be identically described, though at a staggeringly larger scale.  While the SEC required JPMPWA to disgorge a little over $1.3 million in improper fees in that case, the improper fees Mr. Ahmed caused JPM Wealth to take from Mr. Ferdowsi were 30 times higher.  As part of the settlement with the SEC, JPMPWA agreed to "cease and desist from committing … any future violations" of the same charged federal securities laws which prohibit investment advisers from engaging in "fraud and deceit upon any client."  Clearly, JPMPWA did not take this mandate to heart, as Mr. Ahmed ramped up his MLI steering into overdrive in the wake of this May 2022 settlement.  Over the next five months alone, Mr. Ahmed caused Mr. Ferdowsi to purchase almost $300 million of MLIs.  Despite just having settled the SEC's charges for causing advisory clients to pay excessive fees—and ample red flags regarding Mr. Ahmed—JPMPWA did nothing to stop Mr. Ahmed's similar exploitation of Mr. Ferdowsi.

45.     In fact, not only did Mr. Ahmed fail to ever discuss with Mr. Ferdowsi the fees that JPM Wealth was taking on Mr. Ferdowsi's MLI purchases, but he affirmatively sought to conceal the amount of those fees.  In December 2023, growing increasingly concerned about the financial returns from his investments at JPM Wealth, Mr. Ferdowsi sought advice from another financial adviser and showed him his MLI-laden portfolio.  Through this adviser, Mr. Ferdowsi first learned of the troubling behind-the-scenes information that suggested JPM Wealth may have been incentivized to steer him into MLIs due to exorbitant embedded fees.

46.     Immediately upon learning of this, Mr. Ferdowsi saw his entire relationship with Mr. Ahmed in a different light.  Mr. Ferdowsi's eyes opened to the possibility that Mr. Ahmed's

emphasis on MLIs had been driven by his own financial interests rather than Mr. Ferdowsi's. Deeply concerned about the implications, Mr. Ferdowsi confronted Mr. Ahmed on a phone call, asking what portion of the fees on MLIs JPM Wealth had been taking.  In response, Mr. Ahmed claimed that JPM Wealth took very little and that almost all of the fees went to the banks structuring the MLIs.  This was a lie.  JPM Wealth had collected over $40 million in fees and markdowns on Mr. Ferdowsi's MLI transactions.

47.    Suspicious of Mr. Ahmed's response, Mr. Ferdowsi followed up in a messaging thread.  Referencing a recent investment in a Citibank-structured MLI that included a 3.75% underwriting discount, Mr. Ferdowsi asked Mr. Ahmed how the "3.75% is split up between citi and frb."  Mr. Ahmed responded "0.25 FRB/ 3.5% Citi," claiming that Citibank had kept 3.5% while JPM Wealth had only received 0.25%.  This was another lie.  JPM Wealth had received the entire 3.75%.  Mr. Ahmed's bold prevarication aimed not only to conceal his misconduct, but also to create the false impression that JPM Wealth was earning the same fee on the MLIs as had been agreed on for Mr. Ferdowsi's accounts: 0.25%.  In so doing, Mr. Ahmed effectively conceded that he understood Mr. Ferdowsi's expectations regarding the fees JPM Wealth would earn, and that the actual fees far exceeded these expectations.

48.    Later that day, still skeptical, Mr. Ferdowsi pressed for a more detailed explanation around the fees JPM Wealth had taken on the MLIs in an email exchange that included another JPM Wealth employee.  Apparently uncomfortable repeating in front of his colleague the brazen lie he had told earlier, Mr. Ahmed obfuscated with jargon and refused to provide a clear answer, stating: "it is standard practice for the underwriting concession to be disclosed in the prospectus to encompass trading costs, origination fees, option structuring, and financing leverage but with these components all being variable the precise split is undisclosed."  In addition to being evasive, this

was Mr. Ahmed's third lie: the underwriting discount was *on top of* these various costs, not encompassing them.

49.     At no point, even in response to such direct questions, was Mr. Ferdowsi given truthful information regarding the fees that JPM Wealth was earning on the MLIs that Ahmed had advised him to purchase.  Mr. Ahmed's and JPM Wealth's conduct in both charging and concealing these fees constituted securities fraud, investment adviser fraud, and breach of fiduciary duty, among other legal violations.

**B.     MLIs Were Unsuitable Investments That Should Never Have Been Recommended to Mr. Ferdowsi**

50.     JPM Wealth's ability to collect improper fees incentivized numerous other types of wrongdoing by Mr. Ahmed and JPM Wealth.  Foremost among that improper conduct was Mr. Ahmed's recommendation to Mr. Ferdowsi that he invest in MLIs in the first place.  In fact, MLIs were inappropriate and unsuitable investments for Mr. Ferdowsi given his investment objectives and wealth.  Mr. Ahmed was nonetheless incentivized to steer Mr. Ferdowsi into these unsuitable investments.  Simpler, cheaper options, such as a NASDAQ-100 index fund or a basket of large-cap technology stocks, would not have generated the tens of millions of dollars in fees that Mr. Ahmed and JPM Wealth collected from Mr. Ferdowsi's MLI purchases.

51.     As background, MLIs are highly complex, specialized financial instruments whose returns are linked to specific markets (such as equities, commodities, or currencies) over a set period of time.  While MLIs come in many varieties, equity-linked MLIs generally combine two different products.  These are: (1) a zero-coupon bond that pays off at its face amount at maturity but does not make periodic payments like interest or coupons (it is typically issued at a discount to its face amount in *lieu* of such payments); and (2) put and call options tied to the underlying index or basket of indices.

52.     MLIs are designed to be a lucrative product for both the structuring bank and the selling broker.  The structuring bank can effectively sell two different products: a zero-coupon bond and options, earning a profit spread on each.  And as described above, the selling broker can reap a hefty sales commission (often labeled as an underwriting discount).  These profit spreads and sales commissions combine to create a significant drag on the returns of MLIs for investors.  Before realizing any profit, an MLI investor must first recover the substantial fees and commissions embedded in the MLI's purchase price.

53.     Despite this, MLIs are designed to look deceptively attractive to investors.  Brokers often market MLIs by touting the potential upside created by the embedded options.  But focusing on the benefits of the options obfuscates the true costs and risks associated with MLIs.   In particular, MLIs contain significant embedded costs that subject investors to a sizable loss on the very first day.

54.     As a simplified example, consider a $1,000 five-year equity-linked MLI structured to include: (1) a zero-coupon bond with a $1,000 face value maturing in five years; and (2) options on an underlying market (*e.g.*, a stock index) that pay out under specific scenarios related to the performance of that market.  The zero-coupon bond might only be valued at $800 when the MLI is issued (accounting for the time value of money and credit risk), and the options valued at $100.  Therefore, despite the investor paying $1,000 for the MLI, they receive an investment with components valued at just $900 at the time of purchase.  This discrepancy leads to an immediate day-one loss of $100, which the structuring bank and selling broker reap as their profit and sales commission, respectively.

55.     Due to the significant day-one losses—which averaged approximately 6% for the MLIs sold to Mr. Ferdowsi—MLIs often underperform other types of investments, such as index

funds or stocks, which do not incur immediate losses of this magnitude.  This can be very difficult for a lay investor to appreciate, however, as MLIs are exceedingly complex instruments due to their embedded options, which create complicated return profiles described with jargony attributes like "steps," "barriers," and "participations."  These features are difficult to even understand, let alone value, relative to other investments.  For an inexperienced investor like Mr. Ferdowsi, there was little choice but to rely on Mr. Ahmed's advice, recommendations, and good faith in evaluating this type of investment.

56.     Beyond the aforementioned issues that often make MLIs unsuitable for investors, they are particularly inappropriate for someone like Mr. Ferdowsi for additional reasons.

57.     First, in light of Mr. Ferdowsi's wealth and the size of his investments, MLIs are an incredibly inefficient means of investing.  For a more typical investor who might invest $5,000 or $10,000 at a time, an MLI might be the only way for that investor to gain exposure to the particular risk profile the MLI provides.  For such an investor, it would be impossible to separately purchase the MLI's various components (*i.e.*, bonds and options) at that scale.  However, for an investor like Mr. Ferdowsi—who invested up to $70 million in a single MLI—it would have been entirely feasible to purchase each component separately, potentially from different banks, to secure the most attractive terms available.  Through this process, each component of the MLI could have been purchased competitively at its actual day-one value.  Thus, a large investor like Mr. Ferdowsi would be able to both customize the risk profile they seek and reduce any day-one loss on the investment to near zero.

58.     Second, MLIs are also a very inefficient investment from a tax standpoint for an investor like Mr. Ferdowsi, who has the capacity to invest over longer time horizons.  Unlike other types of investments that could have been considered for Mr. Ferdowsi, like an index fund or a

21

basket of stocks, MLIs have debt-like features including a set term.  This term typically ranges from one to five years and averaged four years on the MLIs sold to Mr. Ferdowsi.  Because of that term, Mr. Ferdowsi would be required to exit each MLI by a set date.  This means that if Mr. Ferdowsi's MLIs increased in value, he would be required to realize the gains—and pay taxes on them—on a timetable over which he had little control.  This is a major disadvantage compared to other types of investments, such as index funds or baskets of stocks, which can be held indefinitely, allowing the investor to realize gains (or losses) at a more advantageous time from a tax perspective.

59.     These considerations, among others, made MLIs an entirely unsuitable type of investment for Mr. Ferdowsi taking into account his investment goals and financial profile.  Rather, it would have been far more suitable for Mr. Ferdowsi to have invested in the types of investments that Mr. Ferdowsi had suggested to Mr. Ahmed at various times, including a NASDAQ-100 index fund or a basket of large-cap technology companies such as Apple, Google, and Microsoft.  Mr. Ahmed and JPM Wealth's conduct led Mr. Ferdowsi to invest in MLIs, despite the availability of these more advantageous alternatives.  This constituted violations of numerous legal obligations to Mr. Ferdowsi, including breaches of fiduciary duties and violations of FINRA Rules 2010, 2011, 2111, and 3110, among others.

60.     By steering Mr. Ferdowsi into MLIs, rather than comparable but less fee-generating investments, Mr. Ahmed and JPM Wealth drastically reduced Mr. Ferdowsi's investment returns. If Mr. Ferdowsi had taken the same amounts he invested in MLIs at Mr. Ahmed's recommendation and instead invested them in his own suggested basket of large-cap technology stocks—Apple, Google, and Microsoft—he would have received over $225 million more in investment returns than he did on the MLIs that Mr. Ahmed steered him into.  Or, if the amounts had simply been

invested in a NASDAQ-100 fund, Mr. Ferdowsi would have received nearly $200 million more in investment returns than he actually received on the MLIs.[5]  In either scenario, Mr. Ferdowsi would have been in a much more advantageous position regarding his tax obligations.  Unlike MLIs, neither alternative investment would have required him to recognize any gains until he chose to do so.

       **C.**       **By Churning Mr. Ferdowsi Through A Multitude Of MLIs, Mr. Ahmed And JPM Wealth Enriched Themselves While Causing Greater Injury To Mr. Ferdowsi**

61.      In addition to building improper fees into the MLIs that he steered Mr. Ferdowsi to purchase, Mr. Ahmed magnified those fees by repeatedly advising Mr. Ferdowsi to sell his investments well before their maturity and reinvest the proceeds into new MLIs, without any legitimate investment rationale.

62.      Of the 35 MLIs that Mr. Ferdowsi purchased, Mr. Ahmed recommended selling 24 of them prior to maturity, constituting nearly 70% of the total MLI purchases.  In numerous instances, Mr. Ahmed recommended selling MLIs only three or four months after they had been purchased.  Indeed, while the 35 MLIs sold to Mr. Ferdowsi had a weighted-average term of approximately 3.9 years, Mr. Ferdowsi held them for an average of less than nine months.  And in virtually all instances, Mr. Ahmed recommended that Mr. Ferdowsi reinvest the proceeds from the sales in new MLIs.  It was only through this churning that Mr. Ferdowsi was induced to purchase over $1 billion of MLIs in less than four years, despite never holding more than $350 million worth of MLIs at any one time.  Mr. Ahmed's and JPM Wealth's conduct in causing Mr. Ferdowsi to rotate through MLIs so rapidly was highly problematic for multiple reasons.

---

[5]  As of June 28, 2024.

63.     First, many of the attributes described above render MLIs a suitable investment only when held long-term, if at all.  For example, to ever justify paying the gratuitous transaction costs to purchase an MLI, which averaged about 6% on the MLIs sold to Mr. Ferdowsi, these investments must be held for an extended period to effectively amortize such costs.  In addition, components of MLIs, such as the zero-coupon bonds, only pay out in full at maturity.  Furthermore, because there is no secondary market for MLIs, there is no place to sell them and obtain fair market value, resulting in frequent trading discounts for any MLIs that are sold early.

64.     For these reasons, the SEC has been highly critical of brokers who churn clients through MLIs.  For example, in 2018, the SEC brought charges for securities law violations against Wells Fargo for having "generated large fees by improperly encouraging retail customers to actively trade [MLI] products, which were intended to be held to maturity."  The SEC explained in that case that "the trading strategy—which involved selling the MLIs before maturity and investing the proceeds in new MLIs—generated substantial fees for Wells Fargo, which reduced the customers' investment returns."  When Wells Fargo settled the charges, they were required to disgorge nearly $1 million in "ill-gotten gains" plus interest, and also pay a $4 million penalty.[6]

65.     Mr. Ahmed's and JPM Wealth's conduct regarding Mr. Ferdowsi is exponentially more egregious than the misconduct charged against Wells Fargo.  Whereas Wells Fargo retained less than $1 million in improper fees from nearly 1,500 MLI transactions, Mr. Ahmed and JPM Wealth improperly collected more than 40 times that amount in fees from just 35 MLI transactions involving Mr. Ferdowsi alone.  The damages Mr. Ahmed and JPM Wealth caused Mr. Ferdowsi were also substantially greater than those in the Wells Fargo case, yet they bore the exact same

---

[6]  *See* Press Release, U.S. Securities and Exchange Commission, Wells Fargo Advisors Settles SEC Charges for Improper Sales of Complex Financial Products (June 25, 2018), https://www.sec.gov/newsroom/press-releases/2018-112.

hallmarks: "generating substantial fees" for JPM Wealth while "reduc[ing] [Mr. Ferdowsi's] investment returns"—practices that the SEC has charged as violations of securities laws.

66.     While Mr. Ahmed devised various justifications for churning Mr. Ferdowsi through MLIs, the net effect was Mr. Ferdowsi paying Mr. Ahmed and JPM Wealth another round of above-market fees, while suffering even greater damages himself.

67.     The chart below shows just one example of how Mr. Ahmed's frequent advice to sell MLIs and reinvest in new MLIs impacted Mr. Ferdowsi's investment returns.  The yellow line represents the return that Mr. Ferdowsi would have earned if he had held the $30 million MLI that he purchased on November 19, 2020.  In contrast, the multicolor line shows Mr. Ferdowsi's actual returns after following Mr. Ahmed's advice to swap the original MLI for different ones—first in May 2021, then in September 2021, and again in May 2022.



68.     As the chart illustrates, Mr. Ahmed's advice to repeatedly swap MLIs reduced Mr. Ferdowsi's returns from a slight gain of approximately 5% to a loss of over 25%.  This represents a negative swing of $31.65 per $100 invested, resulting in nearly $10 million of damages for Mr. Ferdowsi—almost a third of his original $30 million investment.  Not coincidentally, while these transactions slashed Mr. Ferdowsi's returns by almost a third, they quadrupled the fees earned by JPM Wealth, from about $1.2 million on the original MLI to about $4.8 million after accounting for the swaps.

69.     By recommending that Mr. Ferdowsi engage in repeated swaps of MLIs, Mr. Ahmed facilitated JPM Wealth collecting fees that were effectively taken right out of Mr. Ferdowsi's investment returns.  This conduct, which prioritized Mr. Ahmed's and JPM Wealth's interests over Mr. Ferdowsi's, violated numerous obligations to Mr. Ferdowsi, including breaches of fiduciary duties and FINRA Rules 2010 and 2020.

### D.     Mr. Ahmed's Stated Justifications For MLI Trades Were Manufactured

70.     In addition to the problematic financial motivation behind Mr. Ahmed's MLI trading recommendations, the justifications he provided to Mr. Ferdowsi for trades were often false.

71.     For example, in the span of a week from late April to early May 2021, Mr. Ahmed recommended that Mr. Ferdowsi sell four MLIs for approximately $78 million, purportedly to meet tax obligations arising from the sale of his Dropbox shares.  In fact, these sales were not justified by Mr. Ferdowsi's tax obligations.  As an initial matter, all but the smallest of these MLIs were purchased less than a year prior, and Mr. Ahmed was aware of the tax obligations at the time of each investment.  Thus, it would have been entirely inappropriate to have advised Mr. Ferdowsi to invest in long-term instruments such as MLIs, if he would need to liquidate them to meet such near-term obligations.  In any event, the MLI sales were not necessary to meet Mr. Ferdowsi's tax

obligations, as Mr. Ahmed ended up steering Mr. Ferdowsi into purchasing $75 million of new MLIs within six weeks of the sales.  The new MLI purchases—effectively funded by the sales of the original MLIs—generated approximately $2.8 million in additional fees for JPM Wealth without any benefit to Mr. Ferdowsi.

72.     Mr. Ahmed also claimed that these MLI sales were justified by providing Mr. Ferdowsi the benefit of "booking profits," as all of the MLIs had appreciated since their purchases, a justification that Mr. Ahmed used on other occasions as well.  To claim that booking profits created a benefit for Mr. Ferdowsi was similarly false.  In fact, because three of the four MLIs that were sold at that time had been held for less than one year, the profits that Mr. Ahmed caused Mr. Ferdowsi to "book" were treated as short-term capital gains for tax purposes.  As a result, the MLI sales were taxed as ordinary income, which was 17 percentage points higher than—and nearly double—the long-term capital gains tax rate that would have applied if the MLIs had been held for over a year.  Thus, far from providing a benefit, these unnecessary early sales created approximately $2.7 million in additional tax liabilities for Mr. Ferdowsi.  Moreover, absent unusual circumstances that were not present for Mr. Ferdowsi, there is rarely a justification for accelerating the booking of profits, as this simply brings forward the time when tax liabilities become due.

73.     Compounding this harm, the unnecessary sales forced Mr. Ferdowsi to make additional estimated tax payments at the end of the second quarter of 2021.  Subsequently, Mr. Ahmed used this as a pretext to recommend even more MLI sales—this time targeting MLIs that had decreased in value—to create "losses we can generate" in order to "help lower our tax estimates."  This represented the height of cynicism: Mr. Ahmed used the prior sales of

*appreciated* MLIs, which served no legitimate purpose, as an excuse to later recommend selling *depreciated* MLIs, again for no legitimate purpose.

74.     The justification of selling MLIs to "harvest losses" in order to reduce Mr. Ferdowsi's tax liabilities was a recurring theme for Mr. Ahmed.  In fact, Mr. Ahmed used that reasoning to recommend that Mr. Ferdowsi sell MLIs and replace them with new MLIs on at least a half dozen occasions in 2022 alone.  These justifications were also false.  While it was true that harvesting losses on MLIs could provide some modest tax benefit to Mr. Ferdowsi, any such benefit was vastly outweighed by the significantly higher costs to Mr. Ferdowsi of entering into new MLI transactions.  This is demonstrated by the fact that although the 14 MLIs that Mr. Ferdowsi sold at a loss in 2022 generated approximately $4 million in tax benefits, these benefits were far eclipsed by the $16.2 million in day-one losses Mr. Ferdowsi suffered from the MLIs he was swapped into.  Once again, the only real beneficiaries of Mr. Ferdowsi's "loss harvesting" in 2022 were Mr. Ahmed and JPM Wealth.  By swapping Mr. Ferdowsi into new MLIs under the guise of tax benefits, Mr. Ahmed and JPM generated over $10.5 million in additional fees, far exceeding the tax benefit to Mr. Ferdowsi.

75.     In sum, the explanations that Mr. Ahmed used to justify trading MLIs were routinely false and served a singular purpose—generating more fees for JPM Wealth at Mr. Ferdowsi's expense.  This conduct violated numerous obligations to Mr. Ferdowsi, including breaches of fiduciary duties and violations of FINRA Rules 2010 and 2020.

## IV.   Mr. Ahmed and JPM Wealth Improperly Profited Through Causing Mr. Ferdowsi's Injury

76.     By committing these violations, Mr. Ahmed and JPM Wealth dramatically enriched themselves while causing substantial financial harm to Mr. Ferdowsi.  Over the span of four years, Mr. Ahmed and JPM Wealth advised Mr. Ferdowsi to invest over $1 billion across 35 MLIs.

Through the underwriting discounts on these MLIs, which ranged from 3.5% to 4.1%, as well as the markdowns on their sales, JPM Wealth collected over $40 million in additional fees, which JPM Wealth shared with Mr. Ahmed.  Had Mr. Ahmed instead recommended suitable investments to Mr. Ferdowsi that aligned with his technology investment focus, such as investing in a basket of large-cap technology stocks, Mr. Ferdowsi's investment returns would have been over $225 million higher.  Mr. Ferdowsi has been damaged by that amount and more through Mr. Ahmed's and JPM Wealth's violations of their duties to him.

**V.   JPMorgan Retaliated Against Mr. Ferdowsi For Identifying Mr. Ahmed's Misconduct**

77.     As if that was not enough, when Mr. Ferdowsi finally began to discover and raise concerns regarding Mr. Ahmed's misconduct, rather than address those concerns, JPMorgan retaliated against Mr. Ferdowsi by shutting down his accounts and terminating their relationship with him.

78.     After first learning in December 2023 that JPM Wealth was likely pocketing significant fees from the MLIs they had steered Mr. Ferdowsi into purchasing, Mr. Ferdowsi confronted Mr. Ahmed about the fees that JPM Wealth had been taking.  As described above, Mr. Ahmed outright lied in response to Mr. Ferdowsi's direct inquiries.  And when Mr. Ferdowsi persisted in asking questions in the presence of another JPM Wealth employee, Mr. Ahmed deflected with jargon-filled gobbledygook that, even when untangled, was false.

79.     From that exchange alone, it was made clear to Mr. Ahmed that Mr. Ferdowsi was concerned about having been improperly steered into purchasing MLIs.  Shortly after that exchange, Mr. Ahmed discontinued all further communication with Mr. Ferdowsi.  This marked a stark change from his established practice of maintaining regular personal contact with Mr. Ferdowsi.

80.    In the weeks that followed, Mr. Ferdowsi continued to investigate Mr. Ahmed's and JPM Wealth's flagrant misconduct to try to understand the full extent to which Mr. Ahmed and JPM Wealth had taken advantage of him.

81.    Subsequently, on January 16, 2024, Mr. Ferdowsi received a voicemail message from Phil Sieg, an executive overseeing JPMPWA, requesting a return call.  Over the next two days, Mr. Ferdowsi received increasingly urgent follow-up messages from Mr. Sieg.  Given the circumstances, Mr. Ferdowsi responded by having his legal counsel return the call to JPMorgan's legal counsel.

82.    On that call, Mr. Ferdowsi's counsel was informed that JPMorgan had decided to terminate all of Mr. Ferdowsi's accounts.  When asked for an explanation, JPMorgan refused to provide one.  JPMorgan's legal counsel followed up with correspondence demanding that Mr. Ferdowsi close his accounts by April 1, 2024, or face having his investments at JPMorgan liquidated.

83.    In light of the timing, the only reasonable inference is that JPMorgan's decision to terminate Mr. Ferdowsi's accounts resulted from the concerns that he had raised with Mr. Ahmed regarding the fees that JPM Wealth had taken on his MLI purchases.  And even after Mr. Ferdowsi's counsel explicitly informed JPMorgan's counsel of Mr. Ferdowsi's serious concerns regarding Mr. Ahmed's management of his accounts, JPMorgan continued to insist that Mr. Ferdowsi close all of his accounts.  The termination was thus in plain retaliation for Mr. Ferdowsi having raised legitimate concerns, as detailed in this Statement of Claim, and further underscores JPM Wealth's significant dereliction of the duties they owed to Mr. Ferdowsi.

84.    This type of misconduct is also not new to JPMorgan.  In fact—in addition to the SEC settlement described earlier—the SEC recently charged JPM Wealth with having impeded

hundreds of advisory clients and brokerage customers from reporting potential securities law violations to the SEC, in violation of the Securities Exchange Act of 1934. On January 16, 2024, coincidentally the same day that Mr. Sieg called to insist that Mr. Ferdowsi close his accounts, JPM Wealth agreed to pay an $18 million civil penalty, to accept a censure, and to cease and desist from further violations of the whistleblower protection rule.[7] In the height of irony, with Mr. Sieg's retaliatory call, JPMorgan failed to make it even one day before violating the same whistleblower protection rule it had just promised the SEC it would abide by.

## VI.   Mr. Ahmed and JPM Wealth's Conduct Violated Various Other SEC Regulations

85.    In addition to the various ways in which Mr. Ahmed and JPM Wealth violated FINRA rules and the SEC's whistleblower protection rule, Mr. Ahmed and JPM Wealth also violated numerous other SEC regulations.

86.    The SEC requires brokers to act in the investor's best interest and not to place their own interests ahead of the investor's interest under Regulation Best Interest ("Reg BI").[8] This subjects a broker to four duties: disclosure, care, conflict of interest, and compliance.

   a)    Under the disclosure obligation, brokers must provide retail customers, in writing, full and fair disclosure of all material facts relating to the scope and terms of the relationship including: (1) that the broker is acting as a broker; (2) the material fees and costs that apply to the retail customer's transactions, holdings, and accounts; and (3) the type and scope of services provided, including any material limitations on the recommended securities

---

[7]    Press Release, U.S. Securities and Exchange Commission, J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule (Jan. 16, 2024), https://www.sec.gov/news/press-release/2024-7

[8]    17 CFR 240.15l-1.

or investment strategies.  In addition, brokers must disclose all material facts relating to conflicts of interest that are associated with their recommendations.

b)      Under the care obligation, brokers must have a reasonable basis to believe that their recommendations are in the best interest of the investor based on the investor's investment profile.  Brokers must not place their own financial or other interests ahead of the investor's.  And brokers must have a reasonable basis to believe that a series of recommended transactions, even if in the investor's best interest when viewed in isolation, is not excessive and is in the investor's best interest when viewed in light of the investor's investment profile.

c)      Under the conflict of interest obligation, brokers must identify and eliminate, or at a minimum disclose, all conflicts of interest associated with the broker's recommendations, especially when the recommendations create an incentive for the broker to place his own interest ahead of the investor.  Moreover, brokers must identify and eliminate any sales contests, sales quotas, bonuses, and non-cash compensation that are based on the sales of specific securities or specific types of securities within a limited period of time.

d)      Finally, under the compliance obligation, brokers must establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with these duties.

87.     The SEC also requires investment advisers to act in the investor's best interest and not to place their own interests ahead of the investor's interest under the Commission Interpretation Regarding Standard of Conduct for Investment Advisers.[9]  In particular, investment advisers owe fiduciary duties to their clients, including the duty of care and the duty of loyalty.

a)      Under the duty of care, investment advisers must provide advice that is in the best interest of the client, including by seeking the best execution of their client's transactions that maximizes the value and minimizes the costs of those transactions.

b)      Under the duty of loyalty, investment advisers must not place their own interests ahead of the client's.  This includes making full and fair disclosures about all material facts relating to the advisory relationship, such as when the person is acting as an investment adviser and eliminating, or at least exposing, all potential conflicts of interest.

88.     Mr. Ahmed and JPM Wealth provided both brokerage services and investment adviser services to Mr. Ferdowsi and as such were obligated to comply with these standards. However, Mr. Ahmed and JPM Wealth flouted and outright acted in contravention of these duties in multiple ways, including by, without limitation:

a)      Placing Mr. Ahmed's and JPM Wealth's interests above Mr. Ferdowsi's by recommending that Mr. Ferdowsi purchase MLIs in order to generate fees for JPM Wealth that would not have been available from more suitable, alternative investments;

---

[9]   84 FR 33669.

33

b)  Failing to disclose fees associated with MLI recommendations and, in fact, lying about how Mr. Ahmed and JPM Wealth were being compensated for those recommendations;

c)  Placing Mr. Ahmed's and JPM Wealth's interests above Mr. Ferdowsi's by churning Mr. Ferdowsi through MLIs to maximize fees while causing him decreased investment returns;

d)  Failing to identify, let alone mitigate, the inherent conflicts of interest in MLI recommendations; and

e)  Failing to seek the best execution of MLI trades.

89.     Mr. Ahmed's and JPM Wealth's conduct should not be allowed to stand.

## CAUSES OF ACTION

## COUNT I
## FRAUD
## (AGAINST AHMED AND JPM WEALTH)

90.     Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

91.     Mr. Ahmed and JPM Wealth carried out a fraudulent campaign in connection with MLI recommendations for Mr. Ferdowsi's account designed to deceive Mr. Ferdowsi and enrich Mr. Ahmed and JPM Wealth.

92.     Mr. Ahmed and JPM Wealth carried out their fraudulent scheme by, among other ways:

a)  Making recommendations and investments in Mr. Ferdowsi's account that were not in his best interests and not suitable for his investment objectives and needs;

b)  Excessively trading and churning Mr. Ferdowsi through MLIs;

c)      Misrepresenting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments, the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

d)      Omitting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments, the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

e)      Failing to advise Mr. Ferdowsi that the investments in his account subjected his account to excessive fees; and

f)      Hiding those excessive fees through a series of nondisclosures and outright misrepresentations.

93.     Mr. Ahmed and JPM Wealth purposefully made these misrepresentations and omissions with the intent to induce Mr. Ferdowsi to rely or act upon them.

94.     Mr. Ahmed and JPM Wealth knew, or should have known, that their misrepresentations and omissions were false at the time they were made.

95.     Mr. Ferdowsi reasonably relied on Mr. Ahmed's and JPM Wealth's misrepresentations and omissions to his detriment, including by investing in MLIs rather than more suitable products for his investment objectives.

96.     As a direct and proximate result of Mr. Ferdowsi's reasonable reliance on Mr. Ahmed's and JPM Wealth's misrepresentations and omissions, Mr. Ferdowsi suffered damages of more than $225 million.  Mr. Ferdowsi is also entitled to punitive damages.

**COUNT II**
**VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§ 25400 AND 25500**
**(AGAINST AHMED AND JPM WEALTH)**

97.     Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

98.     Mr. Ahmed and JPM Wealth created false and misleading statements to induce Mr. Ferdowsi to purchase and sell MLIs by, among other ways:

a)      Misrepresenting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments, the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

b)      Omitting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments, the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

c)      Failing to advise Mr. Ferdowsi that the investments in his account subjected his account to excessive fees; and

d)      Hiding those excessive fees through a series of nondisclosures and outright misrepresentations.

99.     Mr. Ahmed's and JPM Wealth's statements regarding MLIs were, at the time and in the light of the circumstances under which they were made, false and misleading with respect to material facts.

100.     Other statements made by Mr. Ahmed and JPM Wealth regarding MLIs omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.     Mr. Ahmed and JPM Wealth knew or had reasonable grounds to believe these statements were false or misleading.

102.     These statements were made by Mr. Ahmed and JPM Wealth to induce Mr. Ferdowsi to actively trade MLIs through their purchase and sale.

103.     Mr. Ferdowsi was a resident of San Francisco, California, for the vast majority of the period during which Mr. Ahmed and JPM Wealth created their false and misleading statements to induce Mr. Ferdowsi to purchase and sell MLIs.  As a result, Mr. Ferdowsi' injury was largely experienced in California.

104.     Based on the foregoing, Mr. Ahmed and JPM Wealth violated Cal. Corp. Code §§ 25400 and 25500 and are liable to Mr. Ferdowsi.

**COUNT III**
**SECURITIES FRAUD**
**(AGAINST AHMED AND JPM WEALTH)**

**Violations of Section 10(b) of the**
**Securities Exchange Act of 1934 and Rule 10b-5 thereunder**

105.     Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

106.     Through the conduct alleged herein, Mr. Ahmed and JPM Wealth violated Rule 10b-5(a) by employing a device, scheme, or artifice to defraud and violated Rule 10b-5(c) by

engaging in transactions, practices, and courses of business which operated as a fraud or deceit on Mr. Ferdowsi.  Mr. Ahmed and JPM Wealth employed these manipulative and deceptive devices by engaging in the following wrongful acts:

    a)    Making recommendations and investments in Mr. Ferdowsi's account that were not in his best interests and not suitable for his investment objectives and needs;

    b)    Excessively trading and churning Mr. Ferdowsi through MLIs;

    c)    Creating a separate account for Mr. Ferdowsi to churn him through MLIs to avoid the fee arrangement Mr. Ferdowsi had agreed to; and

    d)    Lying about the fees JPM Wealth was earning from MLIs when directly asked.

107.    Additionally, Mr. Ahmed and JPM Wealth violated Rule 10b-5(b) by obtaining money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Mr. Ahmed and JPM Wealth employed these misstatements and omissions by engaging in the following wrongful acts:

    a)    Misrepresenting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments, the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

    b)    Omitting material facts concerning the nature of MLIs, including obfuscating and misrepresenting the fees associated with these investments,

the ways in which Mr. Ahmed and JPM Wealth were being compensated through their recommendation, and the lack of suitability for Mr. Ferdowsi's account;

c)   Failing to advise Mr. Ferdowsi that the investments in his account subjected his account to excessive fees; and

d)   Hiding those excessive fees through a series of nondisclosures and outright misrepresentations.

108.   Mr. Ahmed and JPM Wealth purposefully made these misrepresentations and omissions in order to induce Mr. Ferdowsi to rely upon them.

109.   Mr. Ahmed and JPM Wealth acted with scienter because they knew or were reckless in not knowing that these misstatements and material omissions were false and misleading.  Mr. Ahmed and JPM Wealth had actual knowledge of the material omissions and/or the falsity of the material statements set forth herein and intended to deceive Mr. Ferdowsi, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made to Mr. Ferdowsi.

110.   Mr. Ferdowsi reasonably relied on Mr. Ahmed's and JPM Wealth's fraudulent scheme, misrepresentations, and omissions to his detriment, including by investing in MLIs rather than more suitable products for his investment objectives.

111.   As a direct and proximate result of Mr. Ferdowsi's reasonable reliance on Mr. Ahmed's and JPM Wealth's fraudulent scheme, misrepresentations, and omissions, Mr. Ferdowsi suffered damages of more than $225 million.

112.   Based on the foregoing, Mr. Ahmed violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder and is liable to Mr. Ferdowsi.

**COUNT IV**
**CONTROL PERSON LIABILITY**
**(AGAINST JPM WEALTH)**

**Violations of Section 20(a) of the**
**Securities Exchange Act of 1934**

113.     Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

114.     JPMPWA was at all relevant times a registered investment adviser with the SEC under Section 203(a) of the Investment Advisers Act of 1940 ("Advisers Act").  As a registered investment adviser, JPMPWA has a robust set of duties outlined by statute and rule to supervise persons associated with the registered investment adviser.  Mr. Ahmed's FINRA BrokerCheck Report identifies him as having been a registered representative of JPMPWA since May 24, 2019. JPMPWA thus had a duty to supervise Mr. Ahmed in regard to conduct alleged herein.

115.     JPMS was at all relevant times a registered broker-dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") and a FINRA member. As a broker-dealer, JPMS has a robust set of duties outlined by statute and rule to supervise persons associated with the broker-dealer.  Mr. Ahmed's FINRA BrokerCheck Report identifies him as having been a registered representative of JPMS since September 29, 2023 and a registered representative of FRSC between May 2019 and September 2023 (before FRSC was merged into JPMS as of October 1, 2023, as described above).  JPMS thus had a duty to supervise Mr. Ahmed in regard to conduct alleged herein.

116.     At all relevant times, Mr. Ahmed was under JPM Wealth's (*i.e.*, JPMPWA's and JPMS's) direct supervision, employ, and/or control.  For the avoidance of doubt, Mr. Ahmed's FINRA BrokerCheck Report does not identify him as having been employed by or registered with

First Republic Bank at any time, and First Republic Bank is not herein alleged to have had any supervisory duties in regard to Mr. Ahmed.

117. As detailed above, Mr. Ahmed violated multiple legal duties to Mr. Ferdowsi including by employing a device, scheme, or artifice to defraud.

118. By allowing Mr. Ahmed to engage in that misconduct, JPM Wealth obtained money or property by means of Mr. Ahmed's fraudulent scheme and untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

119. JPM Wealth was aware of, or at a minimum should have been aware of, the fact that Mr. Ahmed's conduct was in violation of legal duties and was causing harm to Mr. Ferdowsi.

120. Mr. Ahmed's conduct was reasonably foreseeable to JPM Wealth.

121. JPM Wealth failed to investigate Mr. Ahmed's conduct.

122. As a direct and proximate result of JPM Wealth's employment and/or control of Ahmed, Mr. Ferdowsi suffered damages of more than $225 million.

## COUNT V
## BREACH OF FIDUCIARY DUTY
## (AGAINST AHMED AND JPM WEALTH)

123. Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

124. Mr. Ahmed, JPM Wealth and Mr. Ferdowsi shared a relationship whereby Mr. Ferdowsi placed his trust and confidence in Mr. Ahmed and JPM Wealth to advise him on and implement suitable investment strategies that would maximize returns on his invested assets without incurring excessive fees, and Mr. Ahmed and JPM Wealth undertook such trust and assumed a duty to advise, counsel, and/or protect Mr. Ferdowsi in connection with his investments.

125.    Mr. Ahmed and JPM Wealth knew that Mr. Ferdowsi was not sophisticated in investment matters and was relying on Mr. Ahmed to provide suitable investment advice and otherwise discharge his duties in a prudent manner.

126.    In providing investment advisory services to Mr. Ferdowsi, Mr. Ahmed and JPM Wealth owed a fiduciary duty to Mr. Ferdowsi, including the duty to refrain from self-dealing, the duty of loyalty, the duty to disclose all material facts, the duty to not take unfair advantage of Mr. Ferdowsi and to act in his best interests, and the duty of care.

127.    Under FINRA Rule 2020, Mr. Ahmed and JPM Wealth had a duty not to effect any transaction or induce the purchase or sale of any security for Mr. Ferdowsi's account by means of manipulative, deceptive, or fraudulent device or contrivance.

128.    Under FINRA Rule 2111, Mr. Ahmed and JPM Wealth had a duty to provide suitable investment advice and recommendations in accordance with Mr. Ferdowsi's investment needs and objectives.  Because Mr. Ahmed and JPM Wealth exercised actual or de facto control over Mr. Ferdowsi's accounts, FINRA Rule 2111 also required Mr. Ahmed and JPM Wealth to have had a reasonable basis for believing that a series of transactions were not excessive or unsuitable for Mr. Ferdowsi when considered together.

129.    Under FINRA Rule 2010, Mr. Ahmed and JPM Wealth had a duty, in the conduct of his business, to observe high standards of commercial honor and just and equitable principles of trade.

130.    Mr. Ahmed and JPM Wealth breached his duties to Mr. Ferdowsi by, without limitation:

a)    Placing their own interest in fee generation over Mr. Ferdowsi's interest in maximizing investment returns;

b) Implementing a trading strategy designed to enrich Mr. Ahmed and JPM Wealth, not Mr. Ferdowsi;

c) Excessively trading Mr. Ferdowsi's accounts;

d) Charging Mr. Ferdowsi excessive fees and commissions;

e) Failing to alert Mr. Ferdowsi to the unsuitable nature of the investments made in, and trading strategy used for, Mr. Ferdowsi's accounts; and

f) Lying about the fees JPM Wealth was earning at Mr. Ferdowsi's expense.

131. As a direct and proximate result of Mr. Ahmed's and JPM Wealth's breaches, Mr. Ferdowsi suffered damages of more than $225 million.

## COUNT VI
## NEGLIGENT SUPERVISION
## (AGAINST JPM WEALTH)

132. Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

133. JPMPWA was at all relevant times a registered investment adviser with the SEC under Section 203(a) of the Advisers Act. As a registered investment adviser, JPMPWA has a robust set of duties outlined by statute and rule to supervise persons associated with the registered investment adviser. Mr. Ahmed's FINRA BrokerCheck Report identifies him as having been a registered representative of JPMPWA since May 24, 2019. JPMPWA thus had a duty to supervise Mr. Ahmed in regard to conduct alleged herein.

134. JPMS was at all relevant times a registered broker-dealer with the SEC under Section 15(b) of the Exchange Act and a FINRA member. As a broker-dealer, JPMS has a robust set of duties outlined by statute and rule to supervise persons associated with the broker-dealer. Mr. Ahmed's FINRA BrokerCheck Report identifies him as having been a registered representative of JPMS since September 29, 2023 and a registered representative of FRSC between

May 2019 and September 2023 (before FRSC was merged into JPMS as of October 1, 2023, as described above). JPMS thus had a duty to supervise Mr. Ahmed in regard to conduct alleged herein.

135. At all relevant times, Mr. Ahmed was under JPM Wealth's (*i.e.*, JPMPWA's and JPMS's) direct supervision, employ, and/or control. For the avoidance of doubt, Mr. Ahmed's FINRA BrokerCheck Report does not identify him as having been employed by or registered with First Republic Bank at any time, and First Republic Bank is not herein alleged to have had any supervisory duties in regard to Mr. Ahmed.

136. JPM Wealth owed a duty to Mr. Ferdowsi to supervise Mr. Ahmed and ensure he was managing Mr. Ferdowsi's accounts in compliance with applicable laws and regulations and in Mr. Ferdowsi's best interest, including by: (1) implementing a trading strategy suitable to Mr. Ferdowsi's needs and objectives; (2) not excessively trading and churning Mr. Ferdowsi's account; and (3) not allowing Mr. Ahmed to use his position with JPM Wealth to fraudulently and negligently make material misrepresentations and omissions to Mr. Ferdowsi.

137. Under FINRA Rule 2010, JPM Wealth had a duty, in the conduct of its business, to observe high standards of commercial honor and just and equitable principles of trade.

138. Additionally, under FINRA Rule 3110, JPM Wealth had a duty to establish and maintain a system to supervise the activities of each registered representative that is reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules.

139. JPM Wealth was aware of, or at minimum should have been aware of, the fact that Mr. Ahmed's conduct was causing harm to Mr. Ferdowsi.

140. Mr. Ahmed's conduct was reasonably foreseeable to JPM Wealth.

141. JPM Wealth failed to investigate Mr. Ahmed's conduct.

142.   As a direct and proximate result of JPM Wealth's negligent supervision of Mr. Ahmed, Mr. Ferdowsi suffered damages of more than $225 million.  Because JPM Wealth was grossly negligent in all of the ways identified herein, Mr. Ferdowsi is also entitled to punitive damages.

<u>**COUNT VII**</u>
<u>**NEGLIGENCE**</u>
<u>**(AGAINST AHMED AND JPM WEALTH)**</u>

143.   Mr. Ferdowsi repeats and re-alleges the allegations contained in paragraphs 1 through 89 as if fully set forth here.

144.   Mr. Ahmed and JPM Wealth owed duties to Mr. Ferdowsi to manage Mr. Ferdowsi's account in Mr. Ferdowsi's best interests, including avoiding excessive trading or churning, recommending suitable investment strategies, seeking best execution, managing Mr. Ferdowsi's accounts in compliance with applicable laws and regulations, and putting Mr. Ferdowsi's interests above their own.

145.   Under FINRA Rule 2111, Mr. Ahmed and JPM Wealth had a duty to provide suitable investment advice and recommendations in accordance with Mr. Ferdowsi's investment needs and objectives.  Because Mr. Ahmed and JPM Wealth exercised actual or de facto control over Mr. Ferdowsi's accounts, FINRA Rule 2111 also required Mr. Ahmed and JPM Wealth to have had a reasonable basis for believing that a series of transactions were not excessive or unsuitable for Mr. Ferdowsi when considered together.

146.   Under FINRA Rule 2010, Mr. Ahmed and JPM Wealth had a duty, in the conduct of their business, to observe high standards of commercial honor and just and equitable principles of trade.

147.     Under FINRA Rule 3110, JPM Wealth also had a duty to establish and maintain a system to supervise associated persons that is reasonably designed to achieve compliance with the applicable securities laws and FINRA rules.

148.     Mr. Ahmed and JPM Wealth breached these duties by failing to act as reasonable investment advisers and broker-dealers would have acted under the circumstances, including by, without limitation, failing to adequately adhere to Mr. Ferdowsi's investment needs and objectives, implementing a trading strategy designed to enrich themselves without regard for the suitability of the strategy for Mr. Ferdowsi, making investments that caused Mr. Ferdowsi to suffer excessive fees and losses, failing to adequately apprise Mr. Ferdowsi of the excessive fees and the inherent conflicts of interest they caused, excessively trading and churning Mr. Ferdowsi's account, and allowing Mr. Ahmed to use his position with JPM Wealth to fraudulently and negligently make material misrepresentations and omissions to Mr. Ferdowsi.

149.     As a direct and proximate result of Mr. Ahmed's and JPM Wealth's breaches, Mr. Ferdowsi suffered damages of more than $225 million.  Because Mr. Ahmed and JPM Wealth were grossly negligent in all of the ways identified herein, Mr. Ferdowsi is also entitled to punitive damages.

<u>**DEMAND FOR RELIEF**</u>

**WHEREFORE**, Claimants demand judgment against Respondents as follows:

a)     Compensatory and rescissory damages in an amount to be determined at arbitration;

b)     Punitive damages in an amount sufficient to punish each Respondent;

c)     Disgorgement of all commissions and fees paid to Respondents;

d)     Pre-judgment and post-judgment interest;

e)     Costs of this action, including Claimants' attorneys' fees; and

f)  Such other and further relief as the Panel deems just and proper.

DATED: July 30, 2024                     QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP


                                         By
                                            Jonathan E. Pickhardt
                                            Blair Adams
                                            51 Madison Avenue, 22nd Floor
                                            New York, New York 10010
                                            Tel: (212) 849-7000
                                            Fax: (212) 849-7100
                                            jonpickhardt@quinnemanuel.com
                                            blairadams@quinnemanuel.com

                                            Michael E. Liftik
                                            1300 I Street NW, Suite 900
                                            Washington, D.C. 20005
                                            Tel: (202) 538-8000
                                            Fax: (202) 538-8100
                                            michaelliftik@quinnemanuel.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that Claimants' **STATEMENT OF CLAIM** was filed using FINRA's online filing portal on this 30th day of July, 2024.

By: _____
        Jonathan E. Pickhardt